# Exhibit 1

1  GREGORY RUEB, Esq. SBN 154589
   greg@drlawllp.com
2  BEHRAM V. PAREKH, SBN 180361
   behram.parekh@drlawllp.com
3  DALIMONTE RUEB STOLLER LLP
4  515 S. Figueroa St. Ste 1550
   Los Angeles, CA 90071
5  T: (925) 457-8415
   T: 619.821.2305
6  F: 855.203.2035
7  *Attorneys for Plaintiffs*





F I L E D
Superior Court of California
County of San Francisco

MAY 21 2021

CLERK OF THE COURT
BY: _____
                    Deputy Clerk

8

9                SUPERIOR COURT OF THE STATE OF CALIFORNIA
                     FOR THE COUNTY OF SAN FRANCISCO
10                        (UNLIMITED JURISDICTION)

11
    THOMAS P. DANIELSON; AN INDIVIDUAL;          Case No. CGC-21-591896
12  NAHID ASHTARI, AN INDIVIDUAL; TIFFANI
    BALLEW, AN INDIVIDUAL; BRANDFORD             ORIGINAL COMPLAINT FOR
13  STROHMAIER, AN INDIVIDUAL; BARBARA           DAMAGES AND DEMAND FOR JURY
14  ANN KORTES, AN INDIVIDUAL; DAVIDSON          TRIAL
    SMITH, AN INDIVIDUAL; DONNA
15  MARSHALL *SURVIVING NEXT OF KIN AND          1.   **Strict Liability – Design Defect**
    PERSONAL REPRESENTATIVE OF THE               2.   **Strict Liability – Failure to Warn**
16  ESTATE OF DECEDENT* ALLEN E.                 3.   **Negligence**
17  MARSHALL; RENEE NIELSEN, AN                  4.   **Fraud**
    INDIVIDUAL; RODNEY CATALANO, AN              5.   **Breach of Express Warranties**
18  INDIVIDUAL; KAREN HALLETT SURVIVING          6.   **Breach of Implied Warranties**
19  NEXT OF KIN AND PERSONAL                     7.   **Exemplary Damages**
    REPRESENTATIVE OF THE ESTATE OF
20  DECEDENT HONORE HEDLUND; BARBARA
    HAGAN, AN INDIVIDUAL; LOWELL STONE,          **JURY TRIAL DEMANDED**
21  AN INDIVIDUAL; MICHELE MYERS, AN
22  INDIVIDUAL; JONATHAN MYERS
    *SURVIVING NEXT OF KIN AND PERSONAL
23  REPRESENTATIVE OF THE ESTATE OF
    DECEDENT* RONALD MYERS; LISA
24  FROMME, AN INDIVIDUAL;  LEE MARX, AN
    INDIVIDUAL; STEVE BIDEGAIN, AN
25  INDIVIDUAL; ELIZABETH ANN KULINSKI-
26  VETTING, AN INDIVIDUAL; KRYSTAL
    THORP, AN INDIVIDUAL; JOAN BENNETT,
27  AN INDIVIDUAL; BRENDA EVANS, AN
28  INDIVIDUAL; MARY MINNIEWEATHER
    SURVIVING NEXT OF KIN AND PERSONAL

BY FAX

1
COMPLAINT

REPRESENTATIVE OF THE ESTATE OF
DECEDENT DELL MINNIEWEATHER;
CAROL WEBB, AN INDIVIDUAL; FLORA
JOHNSON, AN INDIVIDUAL; NANCY
JORGENSEN, AN INDIVIDUAL; DON
WILLIAMS SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF THE
ESTATE OF DECEDENT SALLY A
GONZALEZ; MARY LOUISE JORDAN, AN
INDIVIDUAL; HAGOP TERZIAN, AN
INDIVIDUAL; JAMES BARMBY, AN
INDIVIDUAL; DAVID THOMAS, AN
INDIVIDUAL;  ANTHONY SEMONI, AN
INDIVIDUAL; STEPHANIE SHEPPARD, AN
INDIVIDUAL; PAUL DELANEY, AN
INDIVIDUAL; PERLA GAK, AN INDIVIDUAL;
DESIREE PACHECO, AN INDIVIDUAL;
ANDREW NIETO, AN INDIVIDUAL; DAVID
HASKELL SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF THE
ESTATE OF DECEDENT JIMMIE HASKELL;
KATHERINE WRIGHT SURVIVING NEXT OF
KIN AND PERSONAL REPRESENTATIVE OF
THE ESTATE OF DECEDENT CAROL
BAKER; JUDY CALCAGNO SURVIVING
NEXT OF KIN AND PERSONAL
REPRESENTATIVE OF THE ESTATE OF
DECEDENT JOSEPH CALCAGNO; VANCE
MARSHALL IS A RESIDENT OF
CALIFORNIA AND IS THE SURVIVING
NEXT OF KIN AND PERSONAL
REPRESENTATIVE OF THE ESTATE OF
DECEDENT JOHNNY SAXTON; DANIEL
WHANG, AN INDIVIDUAL; BRUCE
ANACKER, AN INDIVIDUAL; LISA
MURRAY, AN INDIVIDUAL; JOSEFINA
MANIAGO, AN INDIVIDUAL; JESSE
GARCIA, AN INDIVIDUAL; KALVIN
CHAUNCY SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF THE
ESTATE OF DECEDENT KALVIN CHAUNCY,
JR.; REBECCA THOMPSON, AN
INDIVIDUAL; JAMES P. WILSON AN
INDIVIDUAL; TIMOTHY TULLIO, AN
INDIVIDUAL; CAROL REEVE SURVIVING
NEXT OF KIN AND PERSONAL

2

REPRESENTATIVE OF THE ESTATE OF
DECEDENT MICHAEL REEVE; LUCILLE
BOXELL SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF THE
ESTATE OF DECEDENT RICHARD BOXELL;
BECKY PEARSON; AN INDIVIDUAL; LINDA
B. PATTI SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF THE
ESTATE OF DECEDENT FRANK PATTI;
SCOTT FERGUSON SURVIVING NEXT OF
KIN AND PERSONAL REPRESENTATIVE OF
THE ESTATE OF DECEDENT MARI
GWENDOLYN FERGUSON; ALEJANDRA
AVILA-AVILES, AN INDIVIDUAL; MARY
PAGLIONE SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF THE
ESTATE OF DECEDENT MARY STEVENS;
KATIE RAMIREZ, AN INDIVIDUAL; RON
WALTON, AN INDIVIDUAL; THOMAS JOHN
RAYMOND, AN INDIVIDUAL; BERNADETTE
BONHIVERT, AN INDIVIDUAL; CAROL
CLAWSON, AN INDIVIDUAL; ROB
STEWART SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF THE
ESTATE OF DECEDENT ROCKY STEWART;
FREDERICK F. WARMUTH, AN
INDIVIDUAL; BRADLEY RYAN STUCK, AN
INDIVIDUAL; MARY RUBENKING
SURVIVING NEXT OF KIN AND PERSONAL
REPRESENTATIVE OF THE ESTATE OF
DECEDENT CARL RUBENKING; DENNY
EDLIN SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF THE
ESTATE OF DECEDENT GEORGE EDLIN;
RONALD LYSIK, AN INDIVIDUAL;
RACHAEL PESSAH-SUTHERLAND, AN
INDIVIDUAL;

Plaintiffs,

v.

MONSANTO COMPANY, a corporation;
WILBUR-ELLIS COMPANY, LLC, a limited
liability company; WILBUR-ELLIS
NUTRITION, LLC (formerly WILBUR-ELLIS

3

COMPLAINT

1   FEED, LLC); HOME DEPOT PRODUCT
    AUTHORITY, LLC; WALMART INC.; LOWE'S
2   COMPANIES, INC.; PIONEER HOME
    CENTER, INC.; ORCHARD SUPPLY
3   HARDWARE; MEINERS OAKS HARDWARE,
    INC.; HYDRO SCAPE PRODUCTS INC.;
4   BUILDERS MART TRUE VALUE
    HARDWARE; MARK STEVEN'S NURSERY,
5   KMART CORPORATION; SPRADLIN, INC.;
    PLACERVILLE FRUIT GROWERS
6   INCORPORATED; LUCKY STORES, INC. and
    DOES 1 through 100, et al.
7

8

9       Defendants.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs, by and through undersigned attorneys, allege upon information and belief:

## STATEMENT OF THE CASE

1.     In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup® Ready® brand. The stated advantage of Roundup® Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup® Ready®.

3.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.     On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

COMPLAINT

6.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's Lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, and B-cell lymphoma.

7.    The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

8.    Upon information and belief, Wilbur-Ellis Company, LLC and Wilbur-Ellis Nutrition, LLC were responsible for marketing Roundup® and related Monsanto products during the time period in question.

Upon information and belief, Home Depot Product Authority, LLC; Walmart Inc.; Lowe's Companies, Inc.; Pioneer Home Center, Inc.; Orchard Supply Hardware; Meiners Oaks Hardware, Inc.; Hydro Scape Products Inc.; Builders Mart True Value Hardware; Mark Steven's Nursery; Kmart Corporation; Spradlin, Inc.; Placerville Fruit Growers Incorporated; and Lucky Stores, Inc. Distributors were responsible for marketing and selling Roundup® to Plaintiffs during some of the time period in question.

## JURISDICTION AND VENUE

9.    The California Superior Court has jurisdiction over this action pursuant to California Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts." The Statutes under which this action is brought do not specify any other basis for jurisdiction.

10.    The California Superior Court has jurisdiction over the Defendants because, based on information and belief, each is a California resident, a corporation, and/or entity organized under the laws of the State of California, a foreign corporation or association authorized to do business in

COMPLAINT

California and registered with the California Secretary of State or that has sufficient minimum contacts in California, or principle places of business in California or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to California Code of Civil Procedure Section 395(a) because some of the Defendants – Wilbur-Ellis Company, LLC and Wilbur-Ellis Feed, LLC – are residents of San Francisco County.

12.     Furthermore, the Defendants have purposefully availed themselves of the benefits and the protections of the laws within the State of California. Monsanto has had sufficient contact such that the exercise of jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

13.     Plaintiffs seek relief that is within the jurisdictional limits of this Court.

## PARTIES

### PLAINTIFFS

14.     Thomas P. Danielson; Nahid Ashtari; Tiffani Ballew; Brandford Strohmaier; Barbara Ann Kortes; Davidson Smith; Donna Marshall surviving next of kin and Personal Representative of the Estate of Decedent Allen E. Marshall; Renee Nielsen; Rodney Catalano; Karen Hallett surviving next of kin and Personal Representative of the Estate of Decedent Honore Hedlund; Barbara Hagan; Lowell Stone; Michele Myers; Jonathan Myers surviving next of kin and Personal Representative of the Estate of Decedent Ronald Myers; Lisa Fromme; Lee Marx; Steve Bidegain; Elizabeth Ann Kulinski-Vetting; Krystal Thorp; Joan Bennett; Brenda Evans; Mary Minnieweather surviving next of kin and Personal Representative of the Estate of Decedent Dell Minnieweather;  Carol Webb; Flora Johnson;  Nancy Jorgensen; Don Williams surviving next of kin and Personal Representative of the Estate of Decedent Sally A Gonzalez Mary Louise Jordan; Hagop Terzian; James Barmby; David Thomas; Anthony Semoni; Stephanie Sheppard; Paul Delaney; Perla Gak; Desiree Pacheco; Andrew Nieto; David Haskell is surviving next of kin and Personal Representative of the Estate of Decedent Jimmie Haskell,; Katherine Wright; Judy Calcagno surviving next of kin and Personal Representative of the Estate of Decedent Joseph Calcagno; Vance Marshall is a resident of

California and is the surviving next of kin and Personal Representative of the Estate of Decedent Johnny Saxton; Vance Marshall is a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Johnny Saxton; Vance Marshall is a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Johnny Saxton; Daniel Whang; Bruce Anacker; Lisa Murray; Josefina Maniago; Jesse Garcia; Kalvin Chauncy surviving next of kin and Personal Representative of the Estate of Decedent Kalvin Chauncy, Jr.; Rebecca Thompson; James P. Wilson; Timothy Tullio; Carol Reeve surviving next of kin and Personal Representative of the Estate of Decedent Michael Reeve; Plaintiff Lucille Boxell surviving next of kin and Personal Representative of the Estate of Decedent Richard Boxell; Becky Pearson; and Linda B. Patti surviving next of kin and Personal Representative of the Estate of Decedent Frank Patti; Scott Ferguson is a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Mari Gwendolyn Ferguson; Alejandra Avila-Aviles; Mary Paglione is and was at all relevant times a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Mary Stevens; Katie Ramirez; Ron Walton; Thomas John Raymond; Bernadette Bonhivert; Carol Clawson; Rob Stewart surviving next of kin and Personal Representative of the Estate of Decedent Rocky Stewart; Frederick F. Warmuth; Bradley Ryan Stuck; Mary Rubenking surviving next of kin and Personal Representative of the Estate of Decedent Carl Rubenking; Denny Edlin surviving next of kin and Personal Representative of the Estate of Decedent George Edlin; Ronald Lysik; Rachael Pessah-Sutherland are competent individuals, over the age of 18, and at all relevant times were and/or are citizens of the State of California. Plaintiffs submit to the jurisdiction of this court and allege venue in this Court is proper.

15.     Plaintiffs Thomas P. Danielson; Nahid Ashtari; Tiffani Ballew; Brandford Strohmaier; Barbara Ann Kortes; Davidson Smith; Donna Marshall surviving next of kin and Personal Representative of the Estate of Decedent Allen E. Marshall; Renee Nielsen; Rodney Catalano; Karen Hallett surviving next of kin and Personal Representative of the Estate of Decedent Honore Hedlund; Barbara Hagan; Lowell Stone; Michele Myers; Jonathan Myers surviving next of kin and Personal Representative of the Estate of Decedent Ronald Myers; Lisa Fromme; Lee Marx;

Steve Bidegain; Elizabeth Ann Kulinski-Vetting; Krystal Thorp; Joan Bennett; Brenda Evans; Mary surviving next of kin and Personal Representative of the Estate of Decedent Dell Minnieweather; Carol Webb; Flora Johnson;  Nancy Jorgensen; Don Williams surviving next of kin and Personal Representative of the Estate of Decedent Sally A Gonzalez Mary Louise Jordan; Hagop Terzian; James Barmby; David Thomas; Anthony Semoni; Stephanie Sheppard; Paul Delaney; Perla Gak; Desiree Pacheco; Andrew Nieto; David Haskell surviving next of kin and Personal Representative of the Estate of Decedent Jimmie Haskell,; Katherine Wright; Judy Calcagno surviving next of kin and Personal Representative of the Estate of Decedent Joseph Calcagno; Vance Marshall is a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Johnny Saxton; Daniel Whang; Bruce Anacker; Lisa Murray; Josefina Maniago; Jesse Garcia; Kalvin Chauncy surviving next of kin and Personal Representative of the Estate of Decedent Kalvin Chauncy, Jr.; Rebecca Thompson; James P. Wilson; Timothy Tullio; Carol Reeve surviving next of kin and Personal Representative of the Estate of Decedent Michael Reeve; Lucille Boxell surviving next of kin and Personal Representative of the Estate of Decedent Richard Boxell; Becky Pearson; Linda B. Patti surviving next of kin and Personal Representative of the Estate of Decedent Frank Patti; and Scott Ferguson is a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Mari Gwendolyn Ferguson; Alejandra Avila-Aviles; Mary Paglione is and was at all relevant times a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Mary Stevens; Katie Ramirez; Ron Walton; Thomas John Raymond; Bernadette Bonhivert; Carol Clawson; Rob Stewart surviving next of kin and Personal Representative of the Estate of Decedent Rocky Stewart; Frederick F. Warmuth; Bradley Ryan Stuck; Mary Rubenking surviving next of kin and Personal Representative of the Estate of Decedent Carl Rubenking; Denny Edlin surviving next of kin and Personal Representative of the Estate of Decedent George Edlin; Ronald Lysik; Rachael Pessah-Sutherland; were exposed to Roundup® and/or other Monsanto glyphosate-containing products between 1974 and the present, were subsequently diagnosed with Non-Hodgkin's Lymphoma ("NHL"), and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendants' wrongful and negligent conduct in the research,

COMPLAINT

development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

16.     Plaintiff Thomas P. Danielson is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1992 until 2019, while a resident of California, and was diagnosed with Non-Hodgkin's Lymphoma on or around February 13, 2019, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot and Orchard Supply Hardware located in the city of Visalia, County of Tulare, California.

17.     Plaintiff Nahid Ashtari is a resident of California.  Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 2014 until 2020, while a resident of California, and was diagnosed with Non-Hodgkin's Lymphoma on or around February 2020, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the city of Tulare, County of Tulare, California.

18.     Plaintiff Tiffani Ballew is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 2015 until 2019, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around October 05, 2019, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from Builders Mart True Value Hardware located in the city of Lake Isabella, County of Kern, California.

19.     Plaintiff Brandford Strohmaier is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1976 until 1996, while a resident of California, and was diagnosed with Non-Hodgkin's Lymphoma on or around 2014, while a resident of California. Plaintiff purchased Roundup® and/or other Monsanto glyphosate-containing products from local stores in the County of Fresno, California

20.     Plaintiff Barbara Ann Kortes is a current resident of Florida, formally a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1985 until 1987, while a resident of California, and was diagnosed

with Non-Hodgkin's Lymphoma on or around April 03, 1987, while a resident of California. Plaintiff purchased Roundup and/or other Monsanto glyphosate-containing products from The Home Depot located in the city of San Ramon, County of Contra Costa, California, and the city of Pleasanton, County of Alameda, California.

21.     Plaintiff Davidson Smith is a resident of Washington. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1989 until 2020, while originally a resident of California, later a resident of Washington, and was diagnosed with Non-Hodgkin lymphoma on or around July 2019, while a resident of Washington. Plaintiff purchased Roundup and/or other Monsanto glyphosate-containing products from Orchard Supply Hardware, located in the city of Antioch, Contra Costa County, California, and The Home Depot Stores located in the cities of Concord and Pittsburg, Contra Costa County, California.

22.     Plaintiff Donna Marshall is and was at all relevant times a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Allen E. Marshall, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1976 until 2002, then diagnosed with Non-Hodgkin lymphoma, on or around 1993 and subsequently died on December 22, 2003. Decedent purchased Roundup and/or other Monsanto glyphosate-containing products from Walmart located in the city of Turlock, Stanislaus County, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

23.     Plaintiff Renee Nielsen is a resident of Oregon. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1987 until 2019, while originally a resident of California, later a resident of Oregon, and was diagnosed with Non-Hodgkin lymphoma on or around December 2019, while a resident of Oregon. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from Walmart located in Yuba City, Sutter County, California, and Rays General Hardware Store located in Brownsville, Yuba County, California.

24.     Plaintiff Rodney Catalano is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1992 until 2010, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 1999, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from stores located in the cities of Oakdale and Modesto, Stanislaus County, and Jamestown, Tuolumne County, California.

25.     Plaintiff Karen Hallett is resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Honore Hedlund, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1987 until 2000 then diagnosed with Non-Hodgkin lymphoma on or about April 2000 and subsequently died on April 26, 2009. Decedent purchased Roundup and/other Monsanto glyphosate-containing products from Placerville Fruit Growers Inc., in the city of Placerville, County of El Dorado, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and

survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

26.     Plaintiff Barbara Hagan is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1985 until 2002, while originally a resident of Pennsylvania, later a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around September 2, 2020, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from Ace Hardware-Meiners Oaks Hardware located in Ojai, Ventura County, California.

27.     Plaintiff Lowell Stone is a resident of Tennessee. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1977 until 2017, while originally a resident of California, later a resident of Tennessee, and was diagnosed with Non-Hodgkin lymphoma on or around 2013, while a resident of Tennessee. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from Kmart located in the city of Bakersfield, Kern County, California.

28.     Plaintiff Michele Myers is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1975 until 1988, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around August 2009, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the city of Bakersfield, Kern County, California.

29.     Plaintiff Jonathan Myers is and was at all relevant times a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Ronald Myers, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1990 until 2000, then diagnosed with Non-Hodgkin lymphoma on or around January 2019 and subsequently died on January 27, 2019. Decedent purchased Roundup and/other Monsanto glyphosate-containing products from Walmart located in the city of Porterville, Tulare County, California. As a direct and

13

COMPLAINT

proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

30.    Plaintiff Lisa Fromme is a resident of Nebraska. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1981 until 1992, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around April 2014, while a resident of Nebraska. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from local stores located in Orangevale, Sacramento County, California.

31.    Plaintiff Lee Marx is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 2007 to 2019, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around August 2015, while a resident of California. The Roundup and/or other Monsanto glyphosate-containing product Plaintiff was exposed to was purchased at Ace Hardware, located in the city of McKinleyville, Humboldt County, California.

32.    Plaintiff Steve Bidegain is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1980 to 2002, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 2003, while a resident of California. Plaintiff was exposed to the Roundup and/or other Monsanto glyphosate-containing product while employed in the City of Petaluma, County of Sonoma, California.

33.    Plaintiff Elizabeth Ann Kulinski-Vetting is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1990 until May 2019, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around September 2020, while a resident of California. purchased Roundup

and/other Monsanto glyphosate-containing products from Lowe's Home Improvement located in the city of Vacaville, Solano County, California.

34.     Plaintiff Krystal Thorp is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1984 to 1988, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 1987, while a resident of California. The Roundup and/or other Monsanto glyphosate-containing product Plaintiff was exposed to was purchased at The Home Depot stores located in the cities of Santa Clara, Sunnyvale and San Jose, County of Santa Clara, California.

35.     Plaintiff Joan Bennett is a resident of Maryland. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1988 to 2018, while originally a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around October 2012, while a resident of Texas. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from Orchard Supply Hardware located in the City of San Lorenzo, County of Alameda, California.

36.     Plaintiff Brenda Evans is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1987 to 2016, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 2019, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot, Ace Hardware and Orchard Supply Hardware stores located in the city of Fremont, County of Alameda, California.

37.     Plaintiff Mary Minnieweather is a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Dell Minnieweather, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1998 until 2010, then diagnosed with Non-Hodgkin lymphoma on or around 2010, and subsequently died on March 31, 2012. Decedent purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the city of Emeryville, Alameda County, California. As a direct and proximate result of

these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

38.     Plaintiff Carol Webb is a resident of Idaho. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1986 to 2000, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around February 2006 and again on or around July 2007, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from Lowe's stores located in the cities of Sacramento and Folsom, County of Sacramento, California.

39.     Plaintiff Flora Johnson is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1980 until 2015, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 2016, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the city of Sacramento, County of Sacramento, California.

40.     Plaintiff Nancy Jorgensen is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately June 1981 until 1986, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around October 2020, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from Orchard Supply Hardware located in the city of Freemont, Alameda County, California.

41.     Plaintiff Don Williams is and was at all relevant times a resident of Nevada and is the surviving next of kin and Personal Representative of the Estate of Decedent Sally A Gonzalez,

who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable Nevada statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1974 until 2012 then diagnosed with Non-Hodgkin lymphoma on or about 2012 and subsequently died on December 2, 2012. Decedent purchased Roundup and/other Monsanto glyphosate-containing products from Costco, located in the city of Stockton, County of San Joaquin, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to Nevada's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

42.     Plaintiff Mary Louise Jordan is a current resident of New Mexico, formally a resident of California.  Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1981 until 2014, while a resident of Mississippi and California, and was diagnosed with Non-Hodgkin's Lymphoma on or around April 1999, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from Lowes located in the city of West Hills, County of Los Angeles, California.

43.     Plaintiff Hagop Terzian is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1997 until 2017, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 2017, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the cities of Burbank and Glendale, both in the County of Los Angeles, California.

44.     Plaintiff James Barmby is a resident of Tennessee. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately March 1995 until July 2020, while originally a resident of California, later a resident of Tennessee, and was diagnosed

with Non-Hodgkin lymphoma on or around September 30, 2019, while a resident of Tennessee. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from Hydro Scape Products Inc., located in the city of Newhall, County of Los Angeles, California.

45.     Plaintiff David Thomas is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1975 until 1982, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 1982, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from local stores located in the city of Walnut, County of Los Angeles, California.

46.     Plaintiff Anthony Semoni is a resident of Missouri. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1978 to 1984, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around September 2014 and again on or around November 2020, while a resident of Missouri. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from stores located in the cities of Modesto, Stanislaus County, Clearlake, Lake County, Grass Valley and Penn Valley, Nevada County, all in the state of California.

47.     Plaintiff Stephanie Sheppard is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1985 to 2004, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 2011, while a resident of California. The Roundup and/or other Monsanto glyphosate-containing product Plaintiff was exposed to was purchased at stores located in the city of Compton, County of Los Angeles, California.

48.     Plaintiff Paul Delaney is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1986 to 1996, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 2011, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot stores located in the cities of Van Nuys and Santa Clarita, Los Angeles County, California.

COMPLAINT

49.   Plaintiff Perla Gak is a resident of Texas. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately June 1982 until July 2019, while originally a resident of California, later a resident of Texas, and was diagnosed with Non-Hodgkin lymphoma on or around November 2019, while a resident of Texas. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from stores located in Canoga Park, Los Angeles and Woodland Hills, County of Los Angeles, California.

50.   Plaintiff Desiree Pacheco is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1990 to 1995, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 1996, while a resident of California. The Roundup and/or other Monsanto glyphosate-containing product Plaintiff was exposed to was purchased at stores located in the Counties of Los Angeles, California.

51.   Plaintiff Andrew Nieto is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1996 to 2001, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around October 2012, while a resident of California. The Roundup and/or other Monsanto glyphosate-containing product Plaintiff was exposed to was purchased at The Home Depot stores located in the cities of Whittier and La Mirada, County of Los Angeles, California, and Target located in the city of Santa Fe Springs, County of Los Angeles, California.

52.   Plaintiff David Haskell is a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Jimmie Haskell, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1989 until 2014 then diagnosed with Non-Hodgkin lymphoma on or about 2004 and subsequently died on February 4, 2016. Decedent purchased Roundup and/or other Monsanto glyphosate-containing products from Steven's Nursery located in Studio City, County of Los Angeles, state of California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent

19

COMPLAINT

between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

53.    Plaintiff Katherine Wright is and was at all relevant times a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Carol Baker, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1970 to May 2007 then diagnosed with Non-Hodgkin lymphoma on or about 2007, and subsequently died on January 11, 2008. Decedent purchased Roundup and/or other Monsanto glyphosate-containing products from Armstrong Garden Center located in the city of Glendora, County of Los Angeles, California, and from Costco stores located in the cities of Glendora, Azusa and San Dimas, all in the County of Los Angeles, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

54.    Plaintiff Judy Calcagno is a current resident of Texas and is the surviving next of kin and Personal Representative of the Estate of Decedent Joseph Calcagno, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1974 until 1992 then diagnosed with Non-

Hodgkin's Lymphoma and subsequently died on April 04, 2007. Decedent purchased Roundup and/or other Monsanto glyphosate-containing products from Kmart located in the city of West Covina, County of Los Angeles, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

55.     Plaintiff Vance Marshall is a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Johnny Saxton, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 2010 until 2015, while a resident of California, then diagnosed with Non-Hodgkin lymphoma, on or about 2013, while a resident of California and subsequently died on August 31, 2018. Decedent purchased Roundup and/or other Monsanto glyphosate-containing products from The Home Depot located in the City of Huntington Park, County of Los Angeles, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

56.     Plaintiff Daniel Whang is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1988 until 2016, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around July 2019, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot stores located in the cities of Cerritos and City of Industry, County of Los Angeles, and the city of La Habra, County of Orange, California.

57.     Plaintiff Bruce Anacker is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1981 until 1995, while a resident of California, and was diagnosed with Non-Hodgkin's Lymphoma on or around January 2015, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the city of Oxnard, and Lowes located in the city of Oxnard, both in the County of Ventura, California.

58.     Plaintiff Lisa Murray is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1991 until 2016, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 2016, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot, Lowe's Home Improvement and DIY Home Center stores located in the city of Thousand Oaks, Ventura County, California.

59.     Plaintiff Josefina Maniago is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 2000 until 2005, while a resident of California, and was diagnosed with Non-Hodgkin's Lymphoma on or around April 2008, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the cities of Temecula and Murrieta, both in the County of Riverside, California.

60.     Plaintiff Jesse Garcia is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1994 until 2019, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around June 2008 and again on or around 2016, while a resident of California. Plaintiff purchased Roundup and/other

Monsanto glyphosate-containing products from The Home Depot located in the city of Norco, Riverside County, California.

61.     Plaintiff Kalvin Chauncy is a resident of Arizona and is the surviving next of kin and Personal Representative of the Estate of Decedent Kalvin Chauncy, Jr., who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1982 to 1993 then diagnosed with Non-Hodgkin lymphoma on or about 1993, and subsequently died on October 19, 1993. The Roundup and/or other Monsanto glyphosate-containing product Kalvin Chauncy, Jr. was exposed to was purchased at Easton's Farm & Home Center located in Bloomington, San Bernardino County, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

62.     Plaintiff Rebecca Thompson is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately February 1994 until 2008, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around August 2005, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the city of Temecula, Riverside County, California.

63.     Plaintiff James P. Wilson is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1988 until 2014, while originally a resident of Kansas, and later a resident of California, and was diagnosed with Non-Hodgkin`s Lymphoma on or around May 28, 2014, while a resident of California. Plaintiff

COMPLAINT

purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the city of Laguna Niguel, County of Orange, California, and Lowes located in the city of Escondido, County of San Diego, California.

64.     Plaintiff Timothy Tullio is a current resident of Ohio, formally a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1987 until 2020, while a resident of Ohio and California, and was diagnosed with Non-Hodgkin's Lymphoma on or around 10/28/2020, while a resident of Ohio. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the city of San Diego, and Lowes located in the city of Poway, both in the County of San Diego, California.

65.     Plaintiff Carol Reeve is and was at all relevant times a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Michael Reeve, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1995 until 2010, then diagnosed with Non-Hodgkin lymphoma on or around 2010, and subsequently died on May 10, 2015. Decedent purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the city of Carlsbad, San Diego County, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

66.     Plaintiff Lucille Boxell is a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Richard Boxell, who was at all relevant times a

---

24

COMPLAINT

resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately April 1979 to 2015, then diagnosed with Non-Hodgkin lymphoma on or about March 2018, and subsequently died on April 18, 2018. Decedent purchased Roundup and/other Monsanto glyphosate-containing products from Walmart located in the city of Chula Vista, and The Home Depot located in the city of San Diego, both in the County of San Diego, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

67.     Plaintiff Becky Pearson is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately October 1999 to October 2017, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around March 2020, while a resident of California. Plaintiff was exposed to the Roundup and/or other Monsanto glyphosate-containing product while employed in the city of San Juan Capistrano, Orange County, California.

68.     Plaintiff Linda B. Patti is and was at all relevant times a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Frank Patti, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1989 until 1997 then diagnosed with Non-Hodgkin lymphoma on or around June 2002, and subsequently died on January 24, 2021. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the city of Fullerton, Orange County, California. As a direct and proximate result

of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

69.     Plaintiff Scott Ferguson is a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Mari Gwendolyn Ferguson, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1987 until 2002, then diagnosed with Non-Hodgkin lymphoma, on or about September 2002, and subsequently died on January 31, 2003. Decedent purchased Roundup and/other Monsanto glyphosate-containing products from Kmart and Gemco stores located in the city of La Habra, County of Orange, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

70.     Plaintiff Alejandra Avila-Aviles is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1975 until 2019, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 2010, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-

containing products from The Home Depot stores located in the cities of Garde Grove and Costa Mesa, Orange County, California.

71.     Plaintiff Mary Paglione is and was at all relevant times a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent Mary Stevens, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1983 until 1991, then diagnosed with Non-Hodgkin lymphoma on or about August 1989, and subsequently died on March 21, 1991. Decedent purchased Roundup and/other Monsanto glyphosate-containing products from Mission Hardware located in the city of San Gabriel, County of Los Angeles, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

72.     Plaintiff Katie Ramirez is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 2005 until 2010, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around September 3, 2020, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot, Walmart and Lowe's stores located in the cities of Merced and Los Banos, County of Merced, California.

73.     Plaintiff Ron Walton is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1980 until 2015, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around September 29, 2020, while a resident of California. Plaintiff purchased Roundup and/other Monsanto

glyphosate-containing products from The Home Depot stores located in the city of Roseville, Placer County, California.

74.     Plaintiff Thomas John Raymond is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1975 until 2019, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around June 2001, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the city of Lakewood, County of Los Angeles, California, and stores located in the city of Huntington Beach, Orange County, California.

75.     Plaintiff Bernadette Bonhivert is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1979 until 2015, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around July 2020, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot and Lowe's stores located in the city of Escondido, County of San Diego, California.

76.     Plaintiff Carol Clawson is a resident of Hawaii. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1985 until September 2000, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around September 1998, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot located in the city of San Carlos, and Orchard Supply Hardware located in Redwood City, both in San Mateo County, California.

77.     Plaintiff Rob Stewart is a resident of Texas and is the surviving next of kin and Personal Representative of the Estate of Decedent Rocky Stewart, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately August 1990 until August 1996, then diagnosed with Non-Hodgkin lymphoma on or around August 1996, and subsequently died on August 5, 1996. Plaintiff was exposed to the Roundup and/or other Monsanto glyphosate-containing product while

employed in Long Beach, Los Angeles County, California, and Palm Springs, Riverside County, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

78.     Plaintiff Gary Jones is a resident of Arizona. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1975 until 1987, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around April 2011, while a resident of California. Plaintiff was exposed to the Roundup and/or other Monsanto glyphosate-containing product while employed in state of California.

79.     Plaintiff Frederick F. Warmuth is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1991 until 2012, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 2013, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from Walmart located in the city of Rocklin, Placer County, California.

80.     Plaintiff Bradley Ryan Stuck is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately May 1989 to 2005, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 2015, while a resident of California. Plaintiff's parents purchased Roundup and/other Monsanto glyphosate-containing products from stores located in the city of Bakersfield, County of Kern, California.

81.     Plaintiff Mary Rubenking is a resident of Colorado and is the surviving next of kin and Personal Representative of the Estate of Decedent Carl Rubenking, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under

applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1988 to 1990, then diagnosed with Non-Hodgkin lymphoma on or about 1990, and subsequently died on January 3, 1992. Decedent purchased Roundup and/or other Monsanto glyphosate-containing products from Lancaster School District, city of Lancaster, Los Angeles County, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

82: Plaintiff Denny Edlin is and was at all relevant times a resident of California and is the surviving next of kin and Personal Representative of the Estate of Decedent George Edlin, who was at all relevant times a resident of California. Plaintiff brings this claim on behalf of all statutory beneficiaries under applicable California statutes. Decedent was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1976 until 1996, then diagnosed with Non-Hodgkin lymphoma, on or about 1994, and subsequently died on January 31, 1999. Decedent purchased Roundup and/other Monsanto glyphosate-containing products from Imperial Hardware Co., located in the city of El Centro, Imperial County, California. As a direct and proximate result of these injuries, Plaintiff has sustained the following damages: pecuniary losses suffered by reason of Decedent's death, such as medical expenses and funeral expenses; damages suffered by Decedent between the time of injury and death for which Decedent might have maintained an action but for death; the physical, mental and emotional pain and suffering endured by Decedent between the time of his injury and death and the benefit of Decedent's services, companionship, comfort, instruction, guidance, counsel and support. Therefore, pursuant to California's wrongful death and survival

action statutes, Plaintiff seeks all recovery allowed under the statutes and for all claims surviving death.

83.     Plaintiff Ronald Lysik is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately June 1995 to June 2019, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 2010, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from The Home Depot and Lowe's stores located in the city of Torrance, County of Los Angeles, California.

84.     Plaintiff Rachael Pessah-Sutherland is a resident of California. Plaintiff was exposed to Roundup and/or other Monsanto glyphosate-containing products from approximately 1975 to 2013, while a resident of California, and was diagnosed with Non-Hodgkin lymphoma on or around 2013, while a resident of California. Plaintiff purchased Roundup and/other Monsanto glyphosate-containing products from Orchard Supply Hardware and The Home Depot stores located in San Mateo County, California.

85.     Plaintiffs are informed and believe, and based thereon allege, that as a direct and proximate result of Plaintiffs' exposure to Roundup® and/or other Monsanto and/or Monsanto glyphosate-containing products ("Roundup®"), supplied, marketed, and/or distributed by Defendants herein, Plaintiffs suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to Non-Hodgkin's Lymphoma and other cancers, other permanent physical deficits, permanent bodily impairment and other injury sequelae. Plaintiffs' injuries required medical intervention to address the adverse physical effects and damage caused by Plaintiffs' exposure to Roundup® and/or other Monsanto glyphosate-containing products ("Roundup®").

86.     As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Defendants and DOES 1 through 100, inclusive, Plaintiffs used and/or were exposed to Roundup® and diagnosed with serious health injuries including Non-Hodgkin's Lymphoma.

87.     As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs suffered severe mental and physical pain and will sustain permanent injuries and emotional distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

88.     As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs required medical intervention in efforts to maintain and/or save Plaintiffs.

89.     Plaintiffs are individuals who suffered damages as a result of injuries resulting from Plaintiffs' use and/or exposure to Roundup® and are authorized to bring an action for the causes of actions alleged herein including, but not limited to, injuries and damages sustained by Plaintiffs resulting from Plaintiffs' use of and exposure to Roundup®. Said injuries and damages sustained by Plaintiffs were caused or substantially contributed to by the wrongful conduct of Defendants and DOES 1 through 100, inclusive.

90.     The product warnings for Roundup® in effect during the time period Plaintiffs used and/or were exposed to Roundup® were vague, incomplete, or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Roundup® use and/or exposure.

91.     The Defendants and DOES 1 through 100, and each of them, inclusive, did not provide adequate warnings to consumers including Plaintiffs and the general public about the increased risk of the serious adverse events described herein.

92.     Had Plaintiffs been adequately warned by the Defendants and DOES 1 through 100, and each of them, inclusive, of the potential life-threatening side effects of Roundup®, Plaintiffs would not have purchased, used, or been exposed to Roundup®.

93.     By reason of the foregoing, Plaintiffs developed serious and dangerous side effects including Non-Hodgkin's Lymphoma, related injury sequelae, physical pain and suffering, mental anguish, and loss of enjoyment of life. By reason of the foregoing, Plaintiffs suffered economic losses and special damages including, but not limited to, loss of earnings and medical expenses. Plaintiffs' general and special damages exceed the jurisdictional limits of this Court.

94.     Plaintiffs have reviewed potential legal claims and causes of action against the Defendants and have intentionally chosen only to pursue claims based on state law. Any reference to any federal agency, regulation or rule is stated solely as background information, and Plaintiffs are not making any claims which raise federal questions. Thus, California state jurisdiction and venue are proper.

## DEFENDANTS

95.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters in St. Louis, Missouri, and multiple principal places of business throughout the world, including in St. Louis, Missouri, Oxnard, California, Woodland, California, and, at all relevant times to this complaint, San Ramon, California. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup®. Monsanto has regularly transacted and conducted business within the State of California and has derived substantial revenue from goods and products, including Roundup®, used in the State of California and employs sales representatives in the State of California. Specifically, Monsanto operated a residential products division known as the Solaris Group of Monsanto Company (hereinafter "Solaris Group"), headquartered in San Ramon, California. Moreover, upon information and belief, Solaris Group manufactured, registered, distributed, marketed, advertised, and sold Roundup® products to California consumers. At all relevant times, Monsanto has conducted testing, research, and analyses on its Roundup® and other glyphosate-based formulations within California and manufactured said products in California, utilizing principal laboratories and manufacturing sites throughout the State of California in locations such as San Ramon, Oxnard, and Woodland. Monsanto expected or should have expected its acts to have consequences within the State of California because it derived substantial revenue from interstate commerce and invoked the benefits and protection of the State of California's laws.

96.     Defendant Wilbur-Ellis Company LLC is a California limited liability company with its headquarters and principal place of business in San Francisco, California. At all times relevant to this complaint, Wilbur-Ellis Company, LLC sold and distributed Monsanto products, including Roundup®, within the State of California.

COMPLAINT

97.     Defendant Wilbur-Ellis Nutrition LLC (with Wilbur-Ellis Company LLC, hereinafter "Wilbur-Ellis") is a California limited liability company with its headquarters and principal place of business in San Francisco, California. At all times relevant to this complaint, Wilbur-Ellis Nutrition LLC sold and distributed Monsanto products, including Roundup®, within the State of California. Wilbur-Ellis is a main distributor of Roundup®, and, upon information and belief, distributed Roundup® used by Plaintiffs and to which Plaintiffs were exposed.

98.     Defendants Home Depot Product Authority, LLC; Walmart Inc.; Lowe's Companies, Inc.; Pioneer Home Center, Inc.; Orchard Supply Hardware; Meiners Oaks Hardware, Inc.; Hydro Scape Products Inc.; Builders Mart True Value Hardware; Steven's Nursery, Kmart Corporation; Spradlin, Inc.; Placerville Fruit Growers Incorporated; and Lucky Stores, Inc. are California corporations with their principal place of business in California.

99.     At relevant times to this complaint, Home Depot Product Authority, LLC; Walmart Inc.; Lowe's Companies, Inc.; Pioneer Home Center, Inc.; Orchard Supply Hardware; Meiners Oaks Hardware, Inc.; Hydro Scape Products Inc.; Builders Mart True Value Hardware; Mark Steven's Nursery; Kmart Corporation; Spradlin, Inc.; Placerville Fruit Growers Incorporated; and Lucky Stores, Inc. sold Roundup® to Plaintiffs from their storefront in California, and this constituted some of the Roundup® to which Plaintiffs were exposed.

100.     Defendant Home Depot Product Authority, LLC "Home Depot" is a Georgia corporation with its headquarters and principal place of business in Atlanta, Georgia. At all times relevant to this action, Home Depot also regularly conducted, transacted, and solicited business in the state of California. At all times relevant to this action, Home Depot was the entity that distributed the Roundup and/or other Monsanto glyphosate-containing products.

101.     Defendant Walmart Inc "Walmart" is a Delaware corporation with its headquarters and principal place of business in Bentonville, Arkansas. At all times relevant to this action, Walmart also regularly conducted, transacted, and solicited business in the state of California. At all times relevant to this action, Walmart was the entity that distributed the Roundup and/or other Monsanto glyphosate-containing products.

COMPLAINT

102.    Defendant Lowe's Companies, Inc., doing business as Lowe's, "Lowe's" is an American retail company specializing in home improvement. Headquartered in Mooresville, North Carolina, the company operates a chain of retail stores in the United States and Canada. At all times relevant to this action, Lowe's also regularly conducted, transacted, and solicited business in the state of California with many brick and mortar storefronts throughout California. At all times relevant to this action, Lowe's sold Roundup® and/or other Monsanto glyphosate-containing products to these named Plaintiffs.

103.    Defendant Pioneer Home Center, Inc. is a California corporation, doing business as Pioneer True Value, hereafter collectively referred to as "Pioneer", with its headquarters and principal place of business in Tehachapi, California. At all times relevant to this action, Pioneer regularly conducted, transacted, and solicited business in the state of California. At all times relevant to this action, Pioneer was the entity that distributed the Roundup and/or other Monsanto glyphosate-containing products.

104.    Defendant Orchard Supply Hardware Corporation "Orchard Supply Hardware" is a Delaware corporation with its headquarters and principal place of business in Hoffman Estates, Illinois. At all times relevant to this action, Orchard Supply Hardware also regularly conducted, transacted, and solicited business in the state of California with many brick and mortar storefronts throughout California. At all times relevant to this action, Orchard Supply Hardware sold Roundup® and/or other Monsanto glyphosate-containing products to these named Plaintiffs.

105.    Defendants Meiners Oaks Hardware, Inc. is a California a corporation with its headquarters and principal place of business in Ojai, California. At all times relevant to this action, Meiners Oaks Hardware, Inc. regularly conducted, transacted, and solicited business in the state of California. At all times relevant to this action Meiners Oaks Hardware, Inc. was the entity that distributed the Roundup and/or other Monsanto glyphosate-containing products

106.    Defendants Hydro Scape Products Inc. is a California a corporation with its headquarters and principal place of business in Roswell, GA. At all times relevant to this action, Hydro Scape Products Inc. regularly conducted, transacted, and solicited business in the state of

California. At all times relevant to this action Hydro Scape Products Inc. was the entity that distributed the Roundup and/or other Monsanto glyphosate-containing products.

107.    Defendant Kmart Corporation ("Kmart"). is a Michigan corporation, with its headquarters and principal place of business in Plymouth, Michigan. At all times relevant to this action, Kmart regularly conducted, transacted, and solicited business in the state of California. At all times relevant to this action, Kmart was the entity that distributed the Roundup and/or other Monsanto glyphosate-containing products.

108.    Defendant Mark Steven's Nursery is a California a corporation with its headquarters and principal place of business in Cambria, California. At all times relevant to this action, Mark Steven's Nursery regularly conducted, transacted, and solicited business in the state of California. At all times relevant to this action, Mark Steven's Nursery was the entity that distributed the Roundup and/or other Monsanto glyphosate-containing products.

109.    Defendant Spradlin, Inc. is a California corporation, doing business as Builders Mart True Value Hardware, hereafter collectively referred to as "Builders Mart", with its headquarters and principal place of business in Lake Isabella, California. At all times relevant to this action, Builders Mart regularly conducted, transacted, and solicited business in the state of California. At all times relevant to this action, Builders Mart was the entity that distributed the Roundup and/or other Monsanto glyphosate-containing products.

110.    Defendant Placerville Fruit Growers Incorporated ("Placerville Fruit") is a California a corporation with its headquarters and principal place of business in Placerville, California. At all times relevant to this action, Placerville Fruit regularly conducted, transacted, and solicited business in the state of California. At all times relevant to this action, Placerville Fruit was the entity that distributed the Roundup and/or other Monsanto glyphosate-containing products.

111.    Defendant Lucky Stores, Inc. is a Delaware corporation, which formerly did business as Gemco Stores, hereafter collectively referred to as "Lucky Stores", with its headquarters and principal place of business in Dover, Delaware. At all times relevant to this action, Lucky Stores regularly conducted, transacted, and solicited business in the state of California. At all times relevant

to this action, Lucky Stores was the entity that distributed the Roundup and/or other Monsanto glyphosate-containing products.

112.   Plaintiffs are informed and believe, and based thereon allege, that in committing the acts alleged herein, each and every managing agent, agent, representative, and/or employee of the Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers, and/or managing agents.

113.   At all relevant times alleged herein, one or more of the corporate Defendants was, and now is, a corporation with its principal place of business in the State of California and, therefore, is a citizen of the State of California.

114.   The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendant DOES 1 through 100, inclusive, and each of them, are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by the Plaintiffs. Plaintiffs will amend this Complaint to allege the true names and capacities of said DOE Defendants when the same are ascertained.

115.   Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the named Defendants and each of the DOE Defendants was the agent, servant, employee, and/or joint venturer of the other co-Defendants and other DOE Defendants, and each of them, and at all said times, each named Defendant and each DOE Defendant was acting in the full course, scope and authority of said agency, service, employment, and/or joint venture.

116.   Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, Defendants and DOES 1 through 100, inclusive, and each of them, were also known as, formerly known as and/or were the successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, a parent, a subsidiary (wholly or partially owned by, or the whole

or partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable trustees, and/or fiduciaries of and/or were members in an entity or entities engaged in the funding, researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling, distributing, supplying, leasing, buying, offering for sale, selling, inspecting, servicing, contracting others for marketing, warranting, rebranding, manufacturing for others, packaging, and advertising of Roundup® and/or other Monsanto glyphosate-containing products. Defendants and DOES 1 through 100, inclusive, and each of them, are liable for the acts, omissions and tortious conduct of their successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, parents, subsidiaries, affiliates, partners, co-venturers, merged companies, alter egos, agents, equitable trustees, fiduciaries, and/or their alternate entities in that Defendants and DOES 1 through 100, inclusive, and each of them, enjoy the goodwill originally attached to each such alternate entity, acquired the assets or product line (or portion thereof), and in that there has been a virtual destruction of Plaintiffs' remedies against each such alternate entity, and that each such Defendant has the ability to assume the risk spreading role of each such alternate entity.

117. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, Defendants and DOES 1 through 100, inclusive, and each of them, were and are corporations organized and existing under the laws of the State of California or the laws of some state or foreign jurisdiction; that each of the said Defendants and DOE Defendants were and are authorized to do and are doing business in the State of California and regularly conducted business in California, including in San Francisco County.

118. Upon information and belief, at all relevant times, Defendants and DOES 1 through 100, and each of them, inclusive, were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce and into the State of California, including in San Francisco County, either directly or indirectly through third parties or related entities, Roundup® and/or other Monsanto glyphosate-containing products.

119. At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, conducted regular and sustained business and engaged in substantial commerce and business

activity in the State of California, which included but was not limited to selling, marketing and distributing Roundup® and/or other Monsanto glyphosate-containing products in the State of California, including in San Francisco County.

120.    At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, expected or should have expected that their acts would have consequences within the United States of America including the State of California, including San Francisco County, and said Defendants derived and derive substantial revenue therefrom.

## EQUITABLE TOLLING

121.    Plaintiffs suffered an illness that has a latency period and does not arise until years after exposure. Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until made aware that Plaintiffs' illness, including Non-Hodgkin's Lymphoma could be caused by use and/or exposure to Roundup®. The discovery rule applies, and the statute of limitations was tolled until the day Plaintiffs knew or had reason to know that Plaintiffs' illnesses, including Non-Hodgkin's Lymphoma, were linked to Plaintiffs' use and/or exposure to Roundup®.

122.    Within the time period of any applicable statute of limitations, Plaintiffs could not have discovered through the exercise of reasonable diligence that exposure to Roundup® and glyphosate is injurious to human health.

123.    Plaintiffs' actions have been filed within the time period of any applicable and/or tolled statute of limitations.

124.    Plaintiffs did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and/or exposure to Roundup® and glyphosate nor would a reasonable and diligent investigation by Plaintiffs have disclosed that Roundup® and glyphosate would cause Plaintiffs' illnesses.

125.    The expiration of any applicable statute of limitations has been equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment and fraudulent conduct. Through affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiffs the true risks associated with use of and/or exposure to Roundup®.

COMPLAINT

126.    As a result of Defendants' actions, Plaintiffs could not reasonably have known or learned through reasonable diligence that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

127.    Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup®. Defendants had a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which Defendants continue to have exclusive control. Defendants knew that this information was not available to Plaintiffs, Plaintiffs' medical providers and/or health facilities, yet Defendants failed to disclose the information to the public, including Plaintiffs.

128.    Defendants had the ability to and did spend enormous amounts of money in furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on Defendants' representations.

## BACKGROUND

129.    In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.

130.    Since that time, Defendant Monsanto has marketed and sold Roundup®, its formulations, and derivative products, including, but not limited to: RoundUp Quick-Pro, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1, Roundup® Custom Herbicide, Roundup® D-Pak Herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k Herbicide, Roundup® Original II Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready- to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Ready-to-Use Weed & Grass Killer, Roundup® Ready-to-Use Weed and Grass Killer

2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass Killer Ready-to-Use Plus, Roundup® Weed & Grass Killer Super Concentrate, Roundup® Weed & Grass Killer 1 Ready-to-Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate, hereinafter referred to collectively as, "Roundup®" and/or "Roundup®."

131.    Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

132.    Defendant Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Defendant Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup® Ready® brand. The stated advantage of Roundup® Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup® Ready®.[3]

133.    Monsanto's glyphosate products and glyphosate-based formulations are registered in 130 countries and approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006-2007 Market Estimates* 14 (2011), available at https://www.epa.gov/sites/production/files/2015-10/documents/market_estimates2007.pdf.

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), available at http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, available at http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewanted=all.

[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (June 2005), available at https://monsanto.com/app/uploads/2017/06/back_history.pdf.

groundwater in agricultural areas where Roundup® is used.[5] It has been found in food,[6] in the urine

of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with

glyphosate.[8]

134.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an

agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides,

including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in

several countries around the world and it has traced the health implications from exposure to

glyphosate since 2001.

135.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that

monograph, the IARC Working Group provides a thorough review of the numerous studies and data

relating to glyphosate exposure in humans.

136.    The IARC Working Group classified glyphosate as a Group 2A carcinogen, which

means that it is probably carcinogenic to humans. The IARC Working Group concluded that the

cancers most associated with glyphosate exposure are Non-Hodgkin's lymphoma and other

hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell

lymphoma, and multiple myeloma.[9]

137.    The IARC evaluation is significant. It confirms what has been believed for years:

that glyphosate is toxic to humans.

---

[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), available at https://archive.usgs.gov/archive/sites/www.usgs.gov/newsroom/article.asp-ID=2909.html; *see also* Nat'l Pesticide Info. Center, *Glyphosate: General Fact Sheet*. available at http://npic.orst.edu/factsheets/glyphogen.pdf.

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), available at https://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), available at http://www.thelancet.com/journals/lanone/article/PIIS1470-2045(15)70134-8/fulltext.

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), available at http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

[9] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

42

COMPLAINT

138.    More likely than not, glyphosate causes Non-Hodgkin's Lymphoma.

139.    More likely than not, glyphosate-based formulations cause Non-Hodgkin's Lymphoma.

140.    More likely than not, Roundup® causes Non-Hodgkin's Lymphoma.

141.    Nevertheless, Defendant Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Defendant Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## FACTS

142.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

143.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

144.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that

revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

145.     In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate through Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[10] From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.[11]

146.     In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### Registration of Herbicides under Federal Law

147.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all herbicides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

148.     Because herbicides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7

---

[10] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (June 2005). *supra*

[11] *See* Monsanto, *Crop Protection*, https://www.cropscience.bayer.com/customer-updates / (last visited July 13, 2020).

1   U.S.C. § 136a(c)(5)(D).

2   149.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any

3   unreasonable risk to man or the environment, taking into account the economic, social, and

4   environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

5   requires the EPA to make a risk/benefit analysis in determining whether a registration of a product

6   should be granted or allowed so that the product may continue to be sold in commerce.

7   150.    The EPA registered Roundup® for distribution, sale, and manufacture in the United

8   States, including in the State of California. However, the EPA's decision to register Roundup® was

9   based on studies on the active chemical, glyphosate, and not the formulated Roundup® product

10  which contains a cocktail of other ingredients such as surfactants, adjuvants, and inert compounds,

11  all of which, as discussed in greater detail below, contribute to the health risks associated with

12  Roundup® exposure.[12]

13  151.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®,

14  conducts the health and safety testing of pesticide products. The EPA has protocols governing the

15  conduct of tests required for registration and the laboratory practices that must be followed in

16  conducting these tests. The data produced by the registrant must be submitted to the EPA for review

17  and evaluation. The government is not required, nor is it able, however, to perform the product tests

18  that are required of the manufacturer.

19  152.    The evaluation of each herbicide product distributed, sold, or manufactured is

20  completed at the time the product is initially registered. The data necessary for registration of an

21  herbicide has changed over time. The EPA is now in the process of re-evaluating all herbicide

22  products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.

23  In order to reevaluate these herbicides, the EPA is demanding the completion of additional tests and

24  the submission of data for the EPA's review and evaluation.

25  153.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on

26  releasing its preliminary risk assessment—in relation to the re-registration process—no later than

27

28  [12] Surfactants are compounds which contribute to the even and effective spread of glyphosate across the surface of a leaf and increase the rate of penetration through the plant. It has been shown that surfactants also greatly increase the amount and rate of Roundup® absorbed by human skin.

COMPLAINT

July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the risk assessment pending further review in light of the WHO's health-related findings. On September 12, 2016, the EPA's office of Pesticide Programs released an interim report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," ("2016 Issue Paper") detailing the agency's review of a small portion of the existing literature on Roundup®. The 2016 Issue Paper contains a review of studies submitted to the agency by Monsanto, as well as the general independent scientific literature on glyphosate carcinogenicity.

154.     Immediately following the publication of the 2016 Issue Paper, the FIFRA Scientific Advisory Panel ("SAP") issued a report which reviewed the EPA's 2016 Issue Paper, and the conclusions therein. The SAP strongly criticized the EPA's conclusions and questioned the scientific approach of the agency, noting that that agency had failed to follow its own guidelines.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®

155.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[13]

156.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

157.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate herbicide toxicology studies relating to Roundup®.[14] IBT performed about 30 tests on glyphosate and

---

[13] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate 1* (1991), available at https://archive.epa.gov/herbicides/chemicalsearch/chemical/foia/web/pdf/103601/417300-1991-10-30a.pdf.

[14] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (June 2005), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.

glyphosate-containing products, including 9 of the 15 residue studies needed to register Roundup®.

158.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for Roundup® herbicide to be invalid.[15] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[16]

159.    Three top executives of IBT were convicted of fraud in 1983.

160.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform herbicide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of herbicides and herbicides.[17]

161.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

162.    Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc., from 2000-present. These studies minimize any safety concerns about the use of glyphosate, are used to convince regulators to allow the sale of Roundup® and are used to convince customers to use Roundup®. Such studies include, but are not

---

[15] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Herbicide Programs* (1983), available at https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+ 1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFeld Year=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5C Index%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymo us&SortMethod=h%7C&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425 &Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&Maxim umPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[16] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (*citing* U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch.* Washington, D.C. (August 9, 1978)).

[17] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

limited to, Messner (2000); Messner (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have been submitted to and relied upon by the public and the EPA in assessing the safety of glyphosate. Through these means, Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe. In fact, these independent experts have been paid by Monsanto and have failed to disclose the significant role Monsanto had in creating the manuscripts. Monsanto has further ghostwritten editorials for scientists such as Robert Tarone and Henry Miller to advocate for the safety of glyphosate in Newspapers and Magazines. Monsanto has also ghostwritten letters by supposed independent scientists submitted to regulatory agencies who are reviewing the safety of glyphosate.

163.    Monsanto has also violated federal regulations by holding secret *ex parte* meetings and conversations with certain EPA employees in order to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials.

164.    In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

165.    Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendant was able to co-opt this study by becoming the sole provider of data and ultimately wrote the report, which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting a summary of studies relied upon by the BfR. Defendant has used this report, which they wrote, to falsely proclaim the safety of glyphosate.

166.    In October 2015, the Defendant, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate and argued that the IARC classification is mistaken. In January of 2016, Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

167.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

168.    In response, Monsanto began the development and sale of genetically engineered Roundup® Ready® seeds in 1996. Since Roundup® Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup® Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup® Ready® seeds with continued sales of its Roundup® herbicide.

169.    Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup® Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one and accounted for close to half of Monsanto's revenue.[18] Today, glyphosate remains one of the world's largest herbicides by sales volume.

---

[18] David Barboza, *The Power of Roundup: A Weed Killer Is a Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

COMPLAINT

*Monsanto has known for decades that it falsely advertises the safety of Roundup®*

170.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

(a) Remember that environmentally friendly Roundup® herbicide is biodegradable. It will not build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences.

(b) And remember that Roundup® is biodegradable and will not build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you have got a weed, brush, edging or trimming problem.

(c) Roundup® biodegrades into naturally occurring elements.

(d) Remember that versatile Roundup® herbicide stays where you put it. That means there is no washing or leaching to harm customers' shrubs or other desirable vegetation.

(e) This non-residual herbicide will not wash or leach in the soil. It stays where you apply it.

(f) You can apply Roundup® with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade into natural products.

(g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

(i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish.

(j) "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[19]

171.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

(b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

(c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

(d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

(e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

(f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

---

[19] Attorney General of the State of New York, in the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

COMPLAINT

172.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief, still has not done so today.

173.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[20]

### *Classifications and Assessments of Glyphosate*

174.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

175.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's. Preamble.[21] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

176.     One year before the Monograph meeting, the meeting is announced and there is a call for both data and experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes their review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

177.     In assessing an agent, the IARC Working Group reviews the following information:

---

[20] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[21] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

COMPLAINT

      (a)    human, experimental, and mechanistic data;

      (b)    all pertinent epidemiological studies and cancer bioassays; and

      (c)    representative mechanistic data.

The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

178.    In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

179.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

180.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

181.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007, and the most heavily used herbicide in the world in 2012.

182.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

183.    The assessment of the IARC Working Group identified several case-control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposures to glyphosate.

184.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL, and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

185.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

186.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

187.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

188.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

189.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[22] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

190.    The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[23] While this study differed from others in that it was based on a self-administered questionnaire, the results

---

[22] Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra at 77.

[23] Anneclare J. De Roos et al., Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study, 113 Envt'l Health Perspectives 49-54 (2005), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings about Glyphosate's Dangers to Human Health

191.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate.

### Release Patterns

192.    Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[24]

193.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most reported cause of pesticide illness among agricultural workers.[25]

194.    In addition to the toxicity of the active ingredient glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendants' Roundup® products is

---

[24] Nat'l Pesticide Info. Center, *Glyphosate: General Fact Sheet*. supra.

[25] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*. 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[26]

195.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[27]

196.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affect cell." Further, "[s]ince cell cycle disorder such as cancer result from dysfunctions of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[28]

197.     In 2005, a study by Francisco Peixoto entitled "Comparative effects of Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[29]

198.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study

---

[26] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[27] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g.

[28] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), available at https://www.ncbi.nlm.nih.gov/pubmed/15182708.

[29] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), available at https://www.ncbi.nlm.nih.gov/pubmed/16263381.

COMPLAINT

tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[30]

199.     The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup® was and is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

200.     Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

### Recent Worldwide Bans on Roundup®/Glyphosate

201.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers

---

[30] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells,* 22 CHEM. RES. TOXICOL. 97-105 (2008), available at http://big.assets.huffingtonpost.com/france.pdf.

COMPLAINT

have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[31]

202.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[32]

203.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.[33]

204.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray Roundup® has been suspended."[34]

205.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[35]

206.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[36]

### *Proposition 65 Listing*

---

[31] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, available at http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[32] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, MAY 14, 2015, available at https://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440;   see   Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do Mercado nacional*, April 14, 2015, available at   http://www.mpf.mp.br/df/sala-de-imprensa/noticias-df/mpf-df-reforca-pedido-para-que-glifosato-seja-   banido-do-mercado-nacional.

[33] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "Probable Carcinogen"*, NEWSWEEK, JUNE 15, 2015, available at http://www.newsweek.com/france-bans-sale-  monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[34] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May 11, 2015, available at http://bernews.com/2015/05/importation-weed-spray-round-suspended/.

[35] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, available at https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-  herbicides/.

[36] *Columbia   to   ban   coca   spraying   herbicide   glyphosate*, BBC,   May   10,   2015,   available   at http://www.bbc.com/news/world-latin-america-32677411.

COMPLAINT

207.    On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[37] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[38] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following the IARC's assessment of the chemical.[39]

208.    The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." The IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

209.    A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[40] The law also prohibits the discharge of listed chemicals into drinking water.

---

[37] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate* (Sept. 4, 2015), available at https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-tetrachlorvinphos-parathion-malathion-glyphosate.

[38] Frequently Asked Questions, STATE OF CAL. DEPT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, available at http://oag.ca.gov/prop65/faq.

[39] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate, supra.*

[40] *Frequently Asked Questions,* STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra.*

59

COMPLAINT

210.    Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[41]

211.    Monsanto alleged that OEHHA's exclusive reliance of the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[42] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California."[43] Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate First Amendment rights.[44]

212.    On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report ("RAR") on glyphosate.[45] The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment ("BfR"), had produced the RAR as part of the renewal process for glyphosate in the EU.

213.    The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the

---

[41] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, *Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al.*, No. 16- CECG-00183 (Cal. Super. Ct.).

[42] *Id.* at 2.

[43] *Id.* at 3.

[44] *Id.*

[45] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, available at http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

60

COMPLAINT

European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

214.   Based on a review of the RAR, which included data from industry-submitted unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation ("EC") No. 1271/2008."[46] The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

215.   In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals.[47] Although the IARC examined "both glyphosate – an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[48] The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices."[49] The EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[50]

216.   The EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that the ***genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants."*** Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its

---

[46] *Id.*

[47] *EFSA Fact Sheet: Glyphosate, EFSA*, available at
http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.

[48] *Id.*

[49] *Id.*

[50] *Id.*

COMPLAINT

assessment, the *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess used of glyphosate-based formulations in their own territories.*[51] **(Emphasis added).**

217.    Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate. Specifically, the EFSA proposed an acceptable daily intake ("ADI") of 0.5 mg/kg of body weight per day; an acute reference dose ("ARfD") of 0.5 mg/kg of body weight; and an acceptable operator exposure level of ("AOEL") of 0.1 mg/kg of body weight per day.[52]

### *Leading Scientists Dispute the EFSA's Conclusion*

218.    On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[53] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[54]

219.    Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

220.    In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible

---

[51] *Id.*

[52] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, supra.*

[53] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), available at https://www.nrdc.org/sites/default/files/open-letter-from-dr-christopher-portier.pdf   and https://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.

[54] *Id.*

COMPLAINT

reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation, and public health policy.[55]

221.     With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "limited evidence of carcinogenicity" for Non-Hodgkin's lymphoma, but the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applied three levels of evidence in its analysis of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to the IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientist argued, '[l]egitimate public health concerns arise when 'causality is credible,' i.e. when there is limited evidence."[56]

222.     Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, the BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines.

223.     For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from control and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical control in all guidelines, scientific reports, and publications, and, if historical control data is employed, such data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." The BfR's use of historical control data violated these precautions: "only single study used the same mouse strain as the historian controls but was reported more than 10 years after the

---

[55] *Id.*

[56] *Id.*

COMPLAINT

historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[57]

224.    The letter also critiques the EFSA's report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[58]

225.    On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[59]

### Statement of Concern Regarding Glyphosate-Based Herbicides

226.    On February 17, 2016, a consensus statement published in the Journal of Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement, "assessed the safety of glyphosate-based herbicides ("GBHs").[60] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human

---

[57] Id.

[58] Id.

[59] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, available at http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.

[60] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), available at http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

health risks stemming from use of GBHs."[61] The researchers drew seven factual conclusions about GBHs:

      a.    GBHs are the most heavily applied herbicide in the world and usage continues to rise;

      b.    Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

      c.    The half-life of glyphosate in water and soil is longer than previously recognized;

      d.    Glyphosate and its metabolics are widely present in the global soybean supply;

      e.    Human exposures to GBHs are rising;

      f.    Glyphosate is now authoritatively classified as a probable human carcinogen; and

      g.    Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[62]

227.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[63]

228.    The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[64]

229.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further,

---

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

"GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[65]

230.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer-reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[66]

231.    The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and ... this reexamination be accompanied by systemic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicology assessment of the multiple pathways now identified as potentially vulnerable of GBHs.[67]

232.    The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term

---

[65] Id.

[66] Id.

[67] Id.

COMPLAINT

(minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking a reproductive capability and frequency of birth defects.[68]

### The FDA Announces Testing of Glyphosate Residue in Foods

233.    On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokesperson Lauren Sucher explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods."[69]

234.    In 2004, the U.S. Government Accountability Office ("GAO") had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.[70]

235.    Indeed, in the past, both the FDA and the U.S. Department of Agriculture ("USDA") had routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect public health. Ms. Sucher (the FDA spokesperson) now states, however, that "the agency has developed 'streamlined methods' for testing for the weed killer."[71]

236.    The FDA's move is significant as the agency possesses enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.[72]

### European Union Vote on Glyphosate Renewal

237.    The license for glyphosate in the European Union was set to expire in June 2016.

---

[68] Id.

[69] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME. Feb. 17, 2016. available at http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare.

[70] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, *FDA AND USDA SHOULD STRENGTHEN PESTICIDE RESIDUE MONITORING PROGRAMS AND FURTHER DISCLOSE MONITORING LIMITATIONS* (2014), available at http://www.gao.gov/products/GAO-15-38.

[71] Gillam, *supra* note 68.

[72] Id.; Pesticide Q&A, U.S. FOOD AND DRUG ADMINISTRATION. available at https://www.fda.gov/food/foodborneillnesscontaminants/pesticides/ucm583711.htm.

238.    Without extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[73]

239.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

240.    For instance, on March 4, 2016, *The Guardian* reported that France, the Netherlands, and Sweden did not support the EFSA's assessment that glyphosate was harmless.[74] The paper quoted the Swedish Environmental Minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA scientists have been more transparent about their considerations."[75]

241.    The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[76] Leading up to the vote, Italy joined the other EU states in opposing licensing renewal, citing health concerns.[77]

242.    On June 6, 2016, the Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.[78]

---

[73] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis, *European Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, available at http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.

[74] Arthur Neslen, *EU States rebel against plans to relicense weedkiller glyphosate*, THE GUARDIAN, Mar. 4, 2016, available at https://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-relicense-weedkiller-glyphosate.

[75] *Id.*

[76] Arthur Neslen, *Vote on controversial weedkiller's European license postponed*, THE GUARDIAN, Mar. 8, 2016, available at https://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkiller-licence-postponed-glyphosate.

[77] *Id.*

[78] Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV, June 29, 2016, available at https://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate-licence-by-18-months/.

243.   On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical.[79]

244.   On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POEA from all glyphosate-based herbicides, including Roundup®.[80]

On November 13, 2017, after heated debate over whether it causes cancer, and in a very tight vote, the EU voted in favor of a limited (5-year) license for the use of glyphosate.[81]

## LIMITATION ON ALLEGATIONS

245.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

246.   The allegations in this pleading are made pursuant to California law. To the extent California law imposes a duty or obligation on Defendants that exceeds those required by federal law, Plaintiffs does not assert such claims. All claims asserted herein run parallel to federal law, *i.e.*, the Defendants' violations of California law were also violations of federal law. Had Defendants honestly complied with California law, they would also have complied with federal law.

247.   Additionally, Plaintiffs' claims do not seek to enforce federal law. These claims are brought under California law, notwithstanding that such claims run parallel to federal law.

248.   As alleged herein, Defendants violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup®, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

## COUNT I: STRICT LIABILITY (DESIGN DEFECT)

249.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs

---

[79] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, available at https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup- weedkiller-escapes-immediate-ban.

[80] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, available at https://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/.

[81] Caterina Tano, *German vote swings EU decision on 5-year glyphosate renewal*, November 27, 2016, available at https://euobserver.com/environment/140042.

as if fully stated herein.

250.    Plaintiffs bring this strict liability claim against Defendants for defective design.

251.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiffs, as described herein.

252.    At all relevant times, Defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including Plaintiffs.

253.    At all relevant times, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold Roundup® and other glyphosate-based formulations within California and aimed at a California consumer and industrial market. The Wilbur-Ellis Defendants were at all relevant times involved in the marketing, distribution, and sale of Roundup® and glyphosate-based formulations marketed and sold in California.

254.    Home Depot Product Authority, LLC; Walmart Inc.; Lowe's Companies, Inc.; Pioneer Home Center, Inc.; Orchard Supply Hardware; Meiners Oaks Hardware, Inc.; Hydro Scape Products Inc.; Builders Mart True Value Hardware; Mark Steven's Nursery; Kmart Corporation; Spradlin, Inc.; and Placerville Fruit Growers Incorporated; and Lucky Stores, Inc. were at relevant times involved in the marketing and sale of Roundup® and glyphosate-based formulations marketed and sold in California to Plaintiffs.

255.    Defendants' Roundup® products, as researched, tested, developed, designed,

licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the control of Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

256.   Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

257.   At all relevant times, Defendants knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

258.   Therefore, at all relevant times, Defendants' Roundup® products, as researched, tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

    a.   When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

    b.   When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

    c.   When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

    d.   Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e.   Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f.   Defendants knew or should have known at the time of marketing Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

g.   Defendants did not conduct adequate post-marketing surveillance of its Roundup® products; and

h.   Defendants could have employed safer alternative designs and formulations.

259.   Plaintiffs were exposed to Defendants' Roundup® products without knowledge of Roundup®'s dangerous characteristics.

260.   At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of Roundup®'s dangerous characteristics.

261.   Plaintiffs could not reasonably have discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to the Defendants' suppression of scientific information linking glyphosate to cancer.

262.   The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendants' product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products, and Defendants could have designed Roundup® products to make them less dangerous. Indeed, at the time Defendants designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

263.   At the time Roundup® products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

264.   Defendants' defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup®

COMPLAINT

products, including Plaintiffs.

265.    Therefore, as a result of the unreasonably dangerous condition of their Roundup® products, Defendants are strictly liable to Plaintiffs.

266.    The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained injuries.

267.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

268.    As a direct and proximate result of Defendants placing its defective Roundup® products into the stream of commerce, and the resulting injuries, Plaintiffs sustained pecuniary loss including general damages in a sum which exceeds the jurisdictional minimum of this Court.

269.    As a proximate result of Defendants placing their defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other personal injury and damages.

270.    As a proximate result of the Defendants placing its defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs sustained loss of income, loss of earning capacity and/or property damage.

271.    WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II: STRICT LIABILITY (FAILURE TO WARN)

272.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

273.    Plaintiffs bring this strict liability claim against Defendants for failure to warn.

At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold Roundup® and other glyphosate-based formulations within California and aimed at a California consumer and industrial market. The Wilbur-Ellis Defendants were at all relevant times involved in the marketing, distribution, and sale of Roundup® and glyphosate-based formulations marketed and sold in California.

274.    Home Depot Product Authority, LLC; Walmart Inc.; Lowe's Companies, Inc.; Pioneer Home Center, Inc.; Orchard Supply Hardware; Meiners Oaks Hardware, Inc.; Hydro Scape Products Inc.; Builders Mart True Value Hardware; Mark Steven's Nursery; Kmart Corporation; Spradlin, Inc.; and Placerville Fruit Growers Incorporated; Lucky Stores, Inc. Distributors, were at relevant times involved in the marketing and sale of Roundup® and glyphosate-based formulations marketed and sold in California to Plaintiffs.

275.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

276.    At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiffs of dangers associated with Roundup® use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

277.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

278.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiffs.

279.    Despite the fact that Defendants knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as Plaintiffs.

280.    Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers, *i.e.*, the reasonably foreseeable users, of the risks of exposure to its products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate and, further, have made false and/or misleading statements concerning the safety of Roundup® products and glyphosate.

281.    At all relevant times, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

282.    Plaintiffs were exposed to Defendants' Roundup® products without knowledge of their dangerous characteristics.

283.    At all relevant times, Plaintiffs used and/or were exposed to the use of Defendants' Roundup® products while using them for their intended or reasonably foreseeable purposes, without

knowledge of their dangerous characteristics.

284. Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

285. Defendants knew or should have known that the minimal warnings disseminated with their Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

286. The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

287. This alleged failure to warn is not limited to the information contained on Roundup®'s labeling. The Defendants were able, in accord with federal law, to comply with California law by disclosing the known risks associated with Roundup® through other non-labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public information sources. But the Defendants did not disclose these known risks through any medium.

288. To this day, Defendants have failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

289. As a result of their inadequate warnings, Defendants' Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants,

were distributed by Defendants, and used by Plaintiffs.

290.     Defendants are liable to Plaintiffs for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

291.     Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Roundup® products, Plaintiffs could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

292.     As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiffs were injured and sustained pecuniary loss resulting and general damages in a sum exceeding the jurisdictional minimum of this Court.

293.     As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other personal injury and damages.

294.     As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs sustained loss of income, loss of earning capacity and property damage.

295.     WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT III: NEGLIGENCE

296.     Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

297.     Defendants, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold Roundup® and other glyphosate-based formulations within California and aimed at a California consumer and industrial market. The Wilbur-Ellis Defendants were at all relevant times involved in the marketing,

distribution, and sale of Roundup® and glyphosate-based formulations marketed and sold in California.

298.    Home Depot Product Authority, LLC; Walmart Inc.; Lowe's Companies, Inc.; Pioneer Home Center, Inc.; Orchard Supply Hardware; Meiners Oaks Hardware, Inc.; Hydro Scape Products Inc.; Builders Mart True Value Hardware; Steven's Nursery; Kmart Corporation; Spradlin, Inc.; and Placerville Fruit Growers Incorporated; and Lucky Stores, Inc. Distributors were at relevant times involved in the marketing and sale of Roundup® and glyphosate-based formulations marketed and sold in California to Plaintiffs.

299.    At all relevant times, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

300.    At all relevant times, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

301.    At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and, specifically, the carcinogenic properties of the chemical glyphosate.

302.    Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiffs' injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

303.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks

associated with use of and/or exposure to Roundup® and glyphosate-containing products.

304. As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test Roundup® products because they knew that the chemical posed serious health risks to humans.

305. Defendants were negligent in their promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Roundup®, including the Internet, television, print advertisements, etc. Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Roundup® in their promotional efforts, outside of the context of labeling.

306. Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

307. Defendants' negligence included:

    a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

    b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and,

consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use and be exposed to Roundup® products;

g.  Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.  Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.  Representing that their Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to Roundup® products'

COMPLAINT

labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

l.   Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.  Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n.   Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

169.   Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

170.   Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

171.   Defendants' negligence was the proximate cause of Plaintiffs' injuries, *i.e.*, absent Defendants' negligence, Plaintiffs would not have developed cancer.

172.   Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including Plaintiffs, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendants' reckless conduct therefore warrants an award of punitive damages.

173.   As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiffs were injured and have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

174.   As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time

81
COMPLAINT

1  during which Plaintiffs suffered great mental anguish and other personal injury and damages.

2      175.    As a proximate result of Defendants placing defective Roundup® products into the

3  stream of commerce, as alleged herein, Plaintiffs sustained loss of income, loss of earning capacity

4  and property damage.

5      176.    WHEREFORE, Plaintiffs respectfully request this Court enter judgment in Plaintiffs'

6  favor for compensatory and punitive damages, together with interest, costs herein incurred,

7  attorneys' fees and all such other and further relief as this Court deems just and proper.

8                                                **COUNT IV: FRAUD**

9                                              **(MONSANTO)**

10      177.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs

11  as if fully stated herein.

12      178.    Defendant Monsanto has defrauded the agricultural community in general and

13  Plaintiffs in particular by misrepresenting the true safety of its Roundup® and by failing to disclose

14  known risks of cancer.

15      179.    Defendant Monsanto misrepresented and/or failed to disclose, *inter alia*, that:

16  glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer;

17  glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because

18  exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are

19  known to induce oxidative stress in humans and laboratory animals (a precursor to cancer);

20  glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to

21  downstream health conditions including cancer; exposure to glyphosate and AMPA is causally

22  associated with Non-Hodgkin's Lymphoma; and the laboratory tests attesting to the safety of

23  glyphosate were flawed and/or fraudulent.

24      180.    Due to these misrepresentations and omissions, at all times relevant to this litigation,

25  Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within

26  California and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. §

27  156.10(a)(5).

28      181.    Plaintiffs relied on the Defendant's misrepresentations and/or material omissions

regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to purchase and/or use the product. Plaintiffs did not know nor could Plaintiffs have reasonably known of the misrepresentations and/or material omissions by Defendant concerning Roundup® and its active ingredient glyphosate.

182.    The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant Monsanto from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant Monsanto traditionally used to promote the product's efficacy and benefits.

183.    When Defendant Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and the agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup®.

184.    Defendant Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiffs and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiffs and others which proximately caused the injuries as set forth herein.

185.    As a proximate result of Defendant Monsanto's fraudulent and deceitful conduct and representations, Plaintiffs sustained damages and other losses in an amount to be proven at trial.

186.    As a proximate result of Defendant Monsanto's fraud, as alleged herein, Plaintiffs sustained a loss of income, loss of earning capacity, and property damage, including lost income.

187.   WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT V: BREACH OF EXPRESS WARRANTIES
## (MONSANTO)

188.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

189.   At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

190.   Defendant Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

    a.   ensure that its products did not cause the user unreasonably dangerous side effects;

    b.   warn of dangerous and potentially fatal side effects; and

    c.   disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiffs.

191.   As alleged throughout this pleading, the ability of Defendant Monsanto to properly disclose those risks associated with Roundup® is not limited to representations made on the labeling.

192.   At all relevant times, Defendant Monsanto expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant Monsanto in labels,

publications, package inserts, and other written materials intended for consumers and the general public, that Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Roundup® products would conform to the representations.

193.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant Monsanto expressly represented that Roundup® products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiffs, and/or that they were safe and effective as agricultural herbicides.

194.    The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

195.    Defendant Monsanto placed Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

196.    Defendant Monsanto breached these warranties because, among other things, Roundup® products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant Monsanto breached the warranties in the following ways:

a.      Defendant Monsanto represented through its labeling, advertising, and

85

COMPLAINT

marketing materials that Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.     Defendant Monsanto represented that Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that Roundup® products, therefore, were not safer than alternatives available on the market.

197.    Plaintiffs detrimentally relied on the express warranties and representations of Defendant Monsanto concerning the safety and/or risk profile of Roundup® in making a decision to purchase the product. Plaintiffs reasonably relied upon Defendant Monsanto to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate. Plaintiffs would not have purchased or used Roundup® had Defendant Monsanto properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

198.    Defendant Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup® products, as expressly stated within their warnings and labels, and knew that consumers and users such as Plaintiffs could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

199.    Plaintiffs had no knowledge of the falsity or incompleteness of Defendant Monsanto's statements and representations concerning Roundup®.

200.    Plaintiffs used and/or were exposed to Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant Monsanto.

201.    Had the warnings, labels, advertisements, or promotional material for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiffs' injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiffs could have avoided the injuries complained of herein.

202.    As a direct and proximate result of Defendant Monsanto's breach of express warranty, Plaintiffs sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

203.    As a proximate result of Defendant Monsanto's breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other personal injury and damages.

204.    As a proximate result of Defendant Monsanto's breach of express warranty, as alleged herein, Plaintiffs sustained loss of income, loss of earning capacity, and property damage.

205.    WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT VI: BREACH OF IMPLIED WARRANTIES
## (MONSANTO)

206.    Plaintiffs incorporate by reference every allegation set forth in preceding paragraphs as if fully stated herein.

207.    At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which were and are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.

208.    Before the time Plaintiffs were exposed to the aforementioned Roundup® products, Defendant Monsanto impliedly warranted to its consumers, including Plaintiffs, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

209.    But Defendant Monsanto failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

87
COMPLAINT

210.   Plaintiffs were intended beneficiaries of the implied warranties made by Defendant Monsanto to purchasers of its herbicides.

211.   The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant Monsanto.

212.   At all relevant times, Defendant Monsanto was aware that consumers and users of its products, including Plaintiffs, would use Roundup® products as marketed by Defendant Monsanto, which is to say that Plaintiffs were foreseeable users of Roundup®.

213.   Defendant Monsanto intended that Roundup® products be used in the manner in which Plaintiffs, in fact, used them and which Defendant Monsanto impliedly warranted to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

214.   In reliance upon Defendant Monsanto's implied warranty, Plaintiffs used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant Monsanto.

215.   Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

216.   Defendant Monsanto breached its implied warranty to Plaintiffs in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

217.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

218.   As a direct and proximate result of Defendant's breach of implied warranty, Plaintiffs sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

219.   As a proximate result of the Defendant's breach of implied warranty, as alleged

88
COMPLAINT

herein, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other personal injury and damages.

220. As a proximate result of Defendant's breach of implied warranty, as alleged herein, Plaintiffs sustained loss of income, loss of earning capacity, and property damage.

221. WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## EXEMPLARY DAMAGES ALLEGATIONS

222. Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

223. Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of Roundup®. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead farmers and consumers.

224. This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the agricultural industry that Roundup® was harmless to humans, and that full disclosure of the true risks of Roundup® would limit the amount of money Defendants would make selling Roundup® in California. Defendants' objection was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiffs were denied the right to make informed decisions about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiffs' rights.

225. There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiffs request punitive damages against the Defendants for the harms caused to Plaintiffs.

## JURY TRIAL DEMAND

226. Plaintiffs demand trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

227.   WHEREFORE, Plaintiffs request the Court to enter judgment in Plaintiffs' favor and against the Defendants for:

a.   actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b.   exemplary and punitive damages sufficient to punish and deter the Defendants and others from future fraudulent practices;

c.   pre-judgment and post-judgment interest;

d.   costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

e.   any other relief the Court may deem just and proper.

Dated: May 21, 2021          **DALIMONTE RUEB STOLLER, LLP**


By: _Gregory D. Rueb_____

GREGORY RUEB, Esq. SBN 154589
greg@drlawllp.com
BEHRAM V. PAREKH, SBN 180361
behram.parekh@drlawllp.com
DALIMONTE RUEB STOLLER LLP
515 S. Figueroa St. Ste 1550
Los Angeles, CA 90071
T: (925) 457-8415
T: 619.821.2305
F: 855.203.2035

*Attorneys for Plaintiffs*

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Gregory Rueb, Esq. (SBN 154589)<br>Dalimonte Rueb Stoller, LLP<br>515 S. Figueroa St., Ste 1550, Los Angeles, CA 90071<br>TELEPHONE NO.: (925) 457-8415   FAX NO.: (855) 203-2035<br>ATTORNEY FOR *(Name)*: Plaintiffs | **F I L E D**<br>Superior Court of California<br>County of San Francisco<br><br>MAY 21 2021<br><br>CLERK OF THE COURT<br>BY:<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN FRANCISCO
STREET ADDRESS: 400 McAllister St
MAILING ADDRESS: 400 McAllister St
CITY AND ZIP CODE: San Francisco, CA 94105
BRANCH NAME: Civic Center Courthouse

CASE NAME:
Thomas P. Danielson, et al v. Monsanto Company, a corporation, et al

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CGC-21-591896 |
| | | | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[✓] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [✓] is [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time consuming to resolve
   c. [✓] Substantial amount of documentary evidence
   d. [✓] Large number of witnesses
   e. [✓] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a.[✓] monetary   b.[ ] nonmonetary; declaratory or injunctive relief   c.[✓] punitive
4. Number of causes of action *(specify)*:
5. This case [ ] is [✓] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date 05/21/2021
Gregory D. Rueb
_____
(TYPE OR PRINT NAME)                    ▶  *Gregory D. Rueb*
                                            (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]
**CIVIL CASE COVER SHEET**
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum certain to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases, only parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22) Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
      or wrongful eviction)*
  Contract/Warranty Breach  Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case  Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ  Administrative Mandamus
  Writ  Mandamus on Limited Court
    Case Matter
  Writ  Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal  Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400  3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non
    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non tort/non complex)*
  Other Civil Complaint
    *(non tort/non complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Page 2 of 2

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:** **OCT-20-2021**

**TIME:** **10:30AM**

**PLACE:** **Department 610**
**400 McAllister Street**
**San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.  **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

(SEE LOCAL RULE 4)

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**(415) 551-3869**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

MONSANTO COMPANY, a corporation;
(Additional Parties Attachment Form attached)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Thomas P. Danielson
(Additional Parties Attachment Form attached)

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Civic Center Courthouse
400 McAllister St, San Francisco, CA 94102

CASE NUMBER:
*(Número del Caso):*
**CGC-21-591896**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Gregory Rueb, Esq., Dalimonte Rueb Stoller, LLP, 515 S. Figueroa St., Ste 1550, Los Angeles, CA 90071, Tel.: (925) 457-8415

DATE: 05/21/2021          **MAY 2 8 2021**          Clerk, by _____, Deputy
*(Fecha)*                                            *(Secretario)*                        *(Adjunto)*

JACQUELINE CAPREVOTE
BY FAX

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)    [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Thomas P. Danielson, et al v. Monsanto Company, a corporation, et al | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

[✓] Plaintiff    [ ] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

THOMAS P. DANIELSON, AN INDIVIDUAL; NAHID ASHTARI, AN INDIVIDUAL; TIFFANI BALLEW, AN INDIVIDUAL; BRANDFORD STROHMAIER, AN INDIVIDUAL; BARBARA ANN KORTES, AN INDIVIDUAL; DAVIDSON SMITH, AN INDIVIDUAL; DONNA MARSHALL SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT ALLEN E. MARSHALL; RENEE NIELSEN, AN INDIVIDUAL; RODNEY CATALANO, AN INDIVIDUAL; KAREN HALLETT SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT HONORE HEDLUND; BARBARA HAGAN, AN INDIVIDUAL; LOWELL STONE, AN INDIVIDUAL; MICHELE MYERS, AN INDIVIDUAL; JONATHAN MYERS SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT RONALD MYERS; LISA FROMME, AN INDIVIDUAL; LEE MARX, AN INDIVIDUAL; STEVE BIDEGAIN, AN INDIVIDUAL; ELIZABETH ANN KULINSKI-VETTING, AN INDIVIDUAL; KRYSTAL THORP, AN INDIVIDUAL; JOAN BENNETT, AN INDIVIDUAL; BRENDA EVANS, AN INDIVIDUAL; MARY MINNIEWEATHER SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT DELL MINNIEWEATHER; CAROL WEBB, AN INDIVIDUAL; FLORA JOHNSON, AN INDIVIDUAL; NANCY JORGENSEN, AN INDIVIDUAL; DON WILLIAMS SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT SALLY A GONZALEZ; MARY LOUISE JORDAN, AN INDIVIDUAL; HAGOP TERZIAN, AN INDIVIDUAL; JAMES BARMBY, AN INDIVIDUAL; DAVID THOMAS, AN INDIVIDUAL; ANTHONY SEMONI, AN INDIVIDUAL; STEPHANIE SHEPPARD, AN INDIVIDUAL; PAUL DELANEY, AN INDIVIDUAL; PERLA GAK, AN INDIVIDUAL; DESIREE PACHECO, AN INDIVIDUAL; ANDREW NIETO, AN INDIVIDUAL; DAVID HASKELL SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT JIMMIE HASKELL; KATHERINE WRIGHT SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT CAROL BAKER; JUDY CALCAGNO SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT JOSEPH CALCAGNO; VANCE MARSHALL IS A RESIDENT OF CALIFORNIA AND IS THE SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT JOHNNY SAXTON; DANIEL WHANG, AN INDIVIDUAL; BRUCE ANACKER, AN INDIVIDUAL; LISA MURRAY, AN INDIVIDUAL; JOSEFINA MANIAGO, AN INDIVIDUAL; JESSE GARCIA, AN INDIVIDUAL; KALVIN CHAUNCY SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT KALVIN CHAUNCY, JR.; REBECCA THOMPSON, AN INDIVIDUAL; JAMES P. WILSON AN INDIVIDUAL; TIMOTHY TULLIO, AN INDIVIDUAL; CAROL REEVE SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT MICHAEL REEVE; LUCILLE BOXELL SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT RICHARD BOXELL; BECKY PEARSON, AN INDIVIDUAL; LINDA B. PATTI SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT FRANK PATTI; SCOTT FERGUSON SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT MARI GWENDOLYN FERGUSON; ALEJANDRA AVILA-AVILES, AN INDIVIDUAL; MARY PAGLIONE SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT MARY STEVENS; KATIE RAMIREZ, AN INDIVIDUAL; RON WALTON, AN INDIVIDUAL; THOMAS JOHN RAYMOND, AN INDIVIDUAL; BERNADETTE BONHIVERT, AN INDIVIDUAL; CAROL CLAWSON, AN INDIVIDUAL; ROB STEWART SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT ROCKY STEWART; FREDERICK F. WARMUTH, AN INDIVIDUAL; BRADLEY RYAN STUCK, AN INDIVIDUAL; MARY RUBENKING SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT CARL RUBENKING; DENNY EDLIN SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT GEORGE EDLIN; RONALD LYSIK, AN INDIVIDUAL; RACHAEL PESSAH-SUTHERLAND, AN INDIVIDUAL;

Page 2 of 3

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

SUM-200(A)

| SHORT TITLE:<br>Thomas P. Danielson, et al v. Monsanto Company, a corporation, et al | CASE NUMBER: |
|---|---|

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

WILBUR-ELLIS COMPANY, LLC, a limited liability company; WILBUR-ELLIS NUTRITION, LLC (formerly WILBUR-ELLIS FEED, LLC); HOME DEPOT PRODUCT AUTHORITY, LLC; WALMART INC.; LOWE'S COMPANIES, INC.; PIONEER HOME CENTER, INC.; ORCHARD SUPPLY HARDWARE; MEINERS OAKS HARDWARE, INC.; HYDRO SCAPE PRODUCTS INC.; BUILDERS MART TRUE VALUE HARDWARE; MARK STEVEN'S NURSERY, KMART CORPORATION; SPRADLIN, INC.; PLACERVILLE FRUIT GROWERS INCORPORATED; LUCKY STORES, INC. and DOES 1 through 100, et al.

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Steven R. Platt    SBN: 245510
PARKER MILLIKEN CLARK OHARA & SAMUELIAN
555 S. Flower Street, 30th Floor, Los Angeles, CA 90071
TELEPHONE NO.: 213-683-6500    FAX NO.: 213-683-6669
ATTORNEY FOR *(Name):* Defendant Monsanto Company

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME: Thomas P. Danielson, et al. v. Monsanto Company, et al.

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: CGC-21-591896 |
|---|---|---|
| [X] Unlimited  [ ] Limited | [ ] Counter  [X] Joinder | |
| (Amount demanded exceeds $25,000) | (Amount demanded is $25,000 or less) | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) |

JUDGE: Hon. Garrett L. Wong
DEPT: 610

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[X] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [X] is  [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [X] Substantial amount of documentary evidence
   d. [X] Large number of witnesses
   e. [X] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [X] punitive
4. Number of causes of action *(specify):* 6
5. This case [ ] is  [X] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: July 8, 2021

Steven R. Platt
(TYPE OR PRINT NAME)

▶ /s/ Steven R. Platt
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

Westlaw Doc & Form Builder™

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
 Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
 Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
 Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
   Wrongful Death
 Product Liability *(not asbestos or
  toxic/environmental)* (24)
 Medical Malpractice (45)
  Medical Malpractice–
   Physicians & Surgeons
  Other Professional Health Care
   Malpractice
 Other PI/PD/WD (23)
  Premises Liability (e.g., slip
   and fall)
  Intentional Bodily Injury/PD/WD
   (e.g., assault, vandalism)
  Intentional Infliction of
   Emotional Distress
  Negligent Infliction of
   Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
 Business Tort/Unfair Business
  Practice (07)
 Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
 Defamation (e.g., slander, libel)
  (13)
 Fraud (16)
 Intellectual Property (19)
 Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
   *(not medical or legal)*
 Other Non-PI/PD/WD Tort (35)

**Employment**
 Wrongful Termination (36)
 Other Employment (15)

**Contract**
 Breach of Contract/Warranty (06)
  Breach of Rental/Lease
   Contract *(not unlawful detainer
    or wrongful eviction)*
  Contract/Warranty Breach–Seller
   Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
   Warranty
  Other Breach of Contract/Warranty
 Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
   Case
 Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
 Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
 Eminent Domain/Inverse
  Condemnation (14)
 Wrongful Eviction (33)
 Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
   domain, landlord/tenant, or
   foreclosure)*

**Unlawful Detainer**
 Commercial (31)
 Residential (32)
 Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*

**Judicial Review**
 Asset Forfeiture (05)
 Petition Re: Arbitration Award (11)
 Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
   Case Matter
  Writ–Other Limited Court Case
   Review
 Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
   Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
 Antitrust/Trade Regulation (03)
 Construction Defect (10)
 Claims Involving Mass Tort (40)
 Securities Litigation (28)
 Environmental/Toxic Tort (30)
 Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)

**Enforcement of Judgment**
 Enforcement of Judgment (20)
  Abstract of Judgment (Out of
   County)
  Confession of Judgment *(non-
   domestic relations)*
  Sister State Judgment
  Administrative Agency Award
   *(not unpaid taxes)*
  Petition/Certification of Entry of
   Judgment on Unpaid Taxes
  Other Enforcement of Judgment
   Case

**Miscellaneous Civil Complaint**
 RICO (27)
 Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
   harassment)*
  Mechanics Lien
  Other Commercial Complaint
   Case *(non-tort/non-complex)*
  Other Civil Complaint
   *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
 Partnership and Corporate
  Governance (21)
 Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
   Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
   Claim
  Other Civil Petition

1

## **<u>PROOF OF SERVICE</u>**

2

3       I am employed in the County of Los Angeles, State of California.  I am over the age of 18

4   and not a party to the within action.  My business address is 555 South Flower Street, 30th Floor,

5   Los Angeles, California 90071.

6       On July 8, 2021, I served a true and correct copy of the document described as **CIVIL**

7   **CASE COVER SHEET** on the interested parties, as follows:

8   ☒   By submitting an electronic version of the document via FTP upload to the Court's
        Electronic Filing and Service Provider, One Legal
9

10  ☐   By electronic transfer to Case Anywhere via the Internet, pursuant to the Court's Case
        Management Order No. 2 Authorizing Electronic Service dated March 23, 2018.

11  ☐   By placing a true copy in envelope(s) addressed as referenced below. The envelope(s)
        were then sealed and deposited for collection and mailing in accordance with my
12      employer's normal procedures.  I am readily familiar with the firm's practice for
        collection and processing correspondence for mailing.  Under that practice it would be
13      deposited with the U.S. Postal Service, with all postage prepaid, at Los Angeles,
        California, on the same day in the ordinary course of business.
14

15

16      I declare under penalty of perjury under the laws of the State of California that the

17  foregoing is true and correct, and that this Proof of Service was executed on July 8, 2021 at Los

18  Angeles, California.

19

20                                            _____
                                              Lety G. Perez
21

22

23

24

25

26

27

28

1
2
3
4
5
6
7

Steven R. Platt (SBN 245510)
PARKER, MILLIKEN, CLARK,
O'HARA & SAMUELIAN, P.C.
555 S. Flower St., 30th Floor
Los Angeles, CA 90071-2440
Telephone: (213) 683-6500
Facsimile: (213) 683-6669
splatt@pmcos.com

Attorneys for Defendant MONSANTO COMPANY

8

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9

**FOR THE COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| THOMAS P. DANIELSON, *et al.*, | Case No. CGC-21-591896 |
| Plaintiffs, | **ANSWER OF MONSANTO COMPANY TO UNVERIFIED DANIELSON COMPLAINT; DEMAND FOR JURY TRIAL** |
| v. | |
| MONSANTO COMPANY, *et al.*, | |
| Defendants. | Complaint Filed:   May 21, 2021<br>Trial Date:          None Set |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Comes now Defendant MONSANTO COMPANY ("Monsanto") and answers the Complaint of Plaintiffs:

1.     Pursuant to Code of Civil Procedure Section 431.30(d), Monsanto files its general denial to said Complaint and denies, generally and specifically, each and every allegation of said Complaint, and the whole thereof, and denies that Plaintiffs have sustained or will sustain damage in the sum or sums alleged, or in any sum or amount whatsoever or at all.

2.     Further answering the Complaint, Monsanto denies that Plaintiffs and/or Decedents sustained or will sustain any injury, damage or loss by reason of any act or omission of Monsanto.

Monsanto is informed and believes, and therefore alleges the following separate and affirmative defenses:

<div align="center">

FIRST DEFENSE

(FAILURE TO STATE A CAUSE OF ACTION – ALL CAUSES OF ACTION)

</div>

3.     The Complaint, in whole or part, fails to state a claim or cause of action against Monsanto upon which relief can be granted.

<div align="center">

SECOND DEFENSE

(PRODUCT NOT DEFECTIVE OR UNREASONABLY DANGEROUS – ALL CAUSES OF ACTION)

</div>

4.     Plaintiffs' claims against Monsanto are barred in whole because Plaintiffs cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

<div align="center">

THIRD DEFENSE

(LACK OF PROXIMATE CAUSE – ALL CAUSES OF ACTION)

</div>

5.     Any alleged negligent or culpable conduct of Monsanto, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of any injuries allegedly experienced by Plaintiffs and/or Decedents.

<div align="center">FOURTH DEFENSE</div>

<div align="center">(ADEQUATE WARNINGS – ALL CAUSES OF ACTION)</div>

6.      Plaintiffs' claims against Monsanto are barred, in whole or in part, because the products at issue were designed, manufactured, marketed, and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

<div align="center">FIFTH DEFENSE</div>

<div align="center">(STATUTORY AND REGULATORY COMPLIANCE – ALL CAUSES OF ACTION)</div>

7.      Plaintiffs' claims against Monsanto are barred, in whole or in part, because the products at issue were not defective or unreasonably dangerous in that they complied with, at all relevant times, all applicable government safety standards.

<div align="center">SIXTH DEFENSE</div>

<div align="center">(FIFRA STATUTORY PREEMPTION – ALL CAUSES OF ACTION)</div>

8.      Plaintiffs' claims against Monsanto are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling, distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

<div align="center">SEVENTH DEFENSE</div>

<div align="center">(PREEMPTION – CONTINUED EPA APPROVAL – ALL CAUSES OF ACTION)</div>

9.      Plaintiffs' claims against Monsanto are preempted, in whole or in part, because of findings by the United States Environmental Protection Agency ("U.S. EPA") that glyphosate does not cause cancer in humans and/or because of U.S. EPA-approved product labeling.

<div align="center">EIGHTH DEFENSE</div>

<div align="center">(PRIMARY JURISDICTION – ALL CAUSES OF ACTION)</div>

10.      Plaintiffs' claims against Monsanto are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

<div align="center">NINTH DEFENSE</div>

<div align="center">(INDEPENDENT/INTERVENING/SUPERSEDING CAUSES – ALL CAUSES OF ACTION)</div>

11.     Plaintiffs' claims against Monsanto are barred, in whole or in part, because Decedents' and/or Plaintiffs' injuries, if any, were the result of conduct of Plaintiffs, Decedents, independent third parties, and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to pre-existing medical conditions.

<div align="center">TENTH DEFENSE</div>

<div align="center">(RESTATEMENT (SECOND) OF TORTS § 402A, COMMENTS J AND K – ALL CAUSES OF ACTION)</div>

12.     The doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar Plaintiffs' claims against Monsanto in whole or in part.

<div align="center">ELEVENTH DEFENSE</div>

<div align="center">(STATUTE OF LIMITATIONS AND/OR REPOSE – ALL CAUSES OF ACTION)</div>

13.     Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations including, but not limited to, Code of Civil Procedure sections 335.1, 338(d), and 340.8.

<div align="center">TWELFTH DEFENSE</div>

<div align="center">(MISUSE OR FAILURE TO FOLLOW INSTRUCTIONS – ALL CAUSES OF ACTION)</div>

14.     The misuse or abnormal use of the product or failure to follow instructions bar Plaintiffs' claims against Monsanto in whole or in part.

<div align="center">THIRTEENTH DEFENSE</div>

<div align="center">(ALTERNATIVE CAUSES – ALL CAUSES OF ACTION)</div>

15.     If Plaintiffs and/or Decedents suffered injury or damages as alleged, which is denied, such injury or damages resulted from: (a) acts or omissions of persons or entities for which Monsanto is neither liable nor responsible or, in the alternative, Monsanto is entitled to an assessment of the relative degree of fault of all such persons and entities; or (b) resulted from

<div align="center">3</div>

diseases and/or causes that are not related or connected with any product sold, distributed, or manufactured by Monsanto.  Such acts or omissions on the part of others or diseases or causes constitute an independent, intervening and sole proximate cause of Plaintiffs' and/or Decedents' alleged injury or damages.

<div align="center">FOURTEENTH DEFENSE</div>

<div align="center">(LACK OF PRIVITY; NO DUTY – ALL CAUSES OF ACTION)</div>

16.　　Monsanto had no legal relationship or privity with Plaintiffs and/or Decedents and owed no duty to Plaintiffs and/or Decedents by which liability could be attributed to it.

<div align="center">FIFTEENTH DEFENSE</div>

<div align="center">(NO WARRANTIES – ALL CAUSES OF ACTION)</div>

17.　　Monsanto made no warranties of any kind or any representations of any nature whatsoever to Plaintiffs and/or Decedents.  If any such warranties were made, which Monsanto specifically denies, then Plaintiffs and/or Decedents failed to give notice of any breach thereof.

<div align="center">SIXTEENTH DEFENSE</div>

<div align="center">(COMMERCIAL FREE SPEECH – ALL CAUSES OF ACTION)</div>

18.　　Plaintiffs' claims against Monsanto are preempted or otherwise barred in whole or in part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution and Article I, Section 2 of the California Constitution.

<div align="center">SEVENTEENTH DEFENSE</div>

<div align="center">(PUNITIVE DAMAGES UNCONSTITUTIONAL – ALL CAUSES OF ACTION)</div>

19.　　Plaintiffs' claims against Monsanto for punitive damages are barred because such an award would violate Monsanto's due process, equal protection and other rights under the United States Constitution, the California Constitution, and/or other applicable state constitutions – and would be improper under the common law and public policies of the United States, the laws of California and/or other states' laws.

1

<div align="center">EIGHTEENTH DEFENSE</div>

2

<div align="center">(CONDUCT DOES NOT WARRANT PUNITIVE DAMAGES – ALL CAUSES OF ACTION)</div>

3      20.     Plaintiffs' claims against Monsanto for punitive damages are barred because

4  Plaintiffs have failed to allege conduct warranting imposition of punitive damages under

5  California and/or other applicable state laws.

6

<div align="center">NINETEENTH DEFENSE</div>

7

<div align="center">(PUNITIVE DAMAGES BARRED OR LIMITED BY OPERATION OF LAW– ALL CAUSES</div>

8

<div align="center">OF ACTION)</div>

9      21.     Plaintiffs' claims against Monsanto for punitive damages are barred and/or limited

10  by operation of state and/or federal law.

11

<div align="center">TWENTIETH DEFENSE</div>

12

<div align="center">(CONTRIBUTORY/COMPARATIVE NEGLIGENCE – ALL CAUSES OF ACTION)</div>

13      22.     Plaintiffs' claims against Monsanto are barred in whole or in part by Plaintiffs'

14  and/or Decedents' contributory/comparative negligence.

15

<div align="center">TWENTY-FIRST DEFENSE</div>

16

<div align="center">(FAILURE TO MITIGATE DAMAGES – ALL CAUSES OF ACTION)</div>

17      23.     Plaintiffs' claims against Monsanto are barred in whole or in part by Plaintiffs'

18  and/or Decedents' failure to mitigate damages.

19

<div align="center">TWENTY-SECOND DEFENSE</div>

20

<div align="center">(SOPHISTICATED USER DOCTRINE – ALL CAUSES OF ACTION)</div>

21      24.     Plaintiffs' claims against Monsanto are barred in whole or in part by the

22  sophisticated user doctrine.

23

<div align="center">TWENTY-THIRD DEFENSE</div>

24

<div align="center">(COLLATERAL SOURCE – ALL CAUSES OF ACTION)</div>

25      25.     To the extent that Decedents and/or Plaintiffs recovered payments for any alleged

26  injuries from any collateral source(s) or other source(s), Plaintiffs' recovery in this lawsuit, if any,

27  shall be reduced to the extent allowed by applicable law.

28

<div align="center">5</div>

1

<div align="center">

TWENTY-FOURTH DEFENSE

</div>

2

3

<div align="center">

(ALLEGED INJURIES NOT CAUSED BY MONSANTO PRODUCT – ALL CAUSES OF ACTION)

</div>

4           26.     If Plaintiffs and/or Decedents have been injured or damaged, no injury or damages

5   being admitted, such injuries or damages were not caused by a Monsanto product.

6

<div align="center">

TWENTY-FIFTH DEFENSE

</div>

7

<div align="center">

(MISJOINDER OF PARTIES – ALL CAUSES OF ACTION)

</div>

8           27.     Plaintiffs' claims are barred, in whole or in part, because some or all of the parties

9   have been improperly joined in this action.

10

<div align="center">

TWENTY-SIXTH DEFENSE

</div>

11

<div align="center">

(INCONVENIENT VENUE – ALL CAUSES OF ACTION)

</div>

12          28.     Venue is or may be inconvenient for some or all of Plaintiffs' claims.

13

<div align="center">

TWENTY-SEVENTH DEFENSE

</div>

14

<div align="center">

(FRAUD ON FEDERAL AGENCY PREEMPTION – ALL CAUSES OF ACTION)

</div>

15          29.     Any claims based on allegations that Monsanto misled, defrauded, made

16  misrepresentations to, or withheld information from the U.S. EPA are preempted by federal law.

17  *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001); *Nathan Kimmel, Inc. v.*

18  *Dowelanco*, 275 F.3d 1199 (9th Cir. 2002).

19

<div align="center">

TWENTY-EIGHTH DEFENSE

</div>

20

<div align="center">

(RELIEF SOUGHT BASED ON OTHER STATES' LAWS – ALL CAUSES OF ACTION)

</div>

21          30.     Plaintiffs' claims against Monsanto are barred to the extent that Plaintiffs seek

22  relief under the laws of states that do not govern Plaintiffs' claims.

23

<div align="center">

TWENTY-NINTH DEFENSE

</div>

24

<div align="center">

(PUNITIVE DAMAGES BARRED – WRONGFUL DEATH CAUSE OF ACTION)

</div>

25          31.     To the extent Plaintiffs assert a wrongful death cause of action, Plaintiffs' request

26  for punitive damages is barred because punitive damages are not available under California law

27  for a wrongful death cause of action.

28

<div align="center">

6

</div>

1

<u>THIRTIETH DEFENSE</u>

2

(RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES – ALL CAUSES OF

3

ACTION)

4

32.     Monsanto hereby gives notice that it intends to rely upon such other defenses as

5

may become available or apparent during the course of discovery and thus reserves its right to

6

amend this Answer to assert such defenses.

7

WHEREFORE, Monsanto prays as follows:

8

1.     That Plaintiffs take nothing by way of the Complaint;

9

2.     That the Complaint be dismissed, in its entirety with prejudice;

10

3.     That Monsanto be awarded judgment in this action;

11

4.     That Monsanto be awarded costs of suit;

12

5.     That Monsanto be awarded such other and further relief as the Court deems

13

just and proper.

14

Dated:  July 8, 2021                    PARKER, MILLIKEN, CLARK, O'HARA &
                                        SAMUELIAN, P.C.

15

16

/s/ Steven R. Platt
                                        Steven R. Platt (SBN 245510)

17

18

Attorneys for Defendant MONSANTO COMPANY

19

20

**DEMAND FOR JURY TRIAL**

21

Defendant MONSANTO COMPANY hereby demands a jury trial in the above-entitled

22

action.

23

Dated:  July 8, 2021                    PARKER, MILLIKEN, CLARK, O'HARA &
                                        SAMUELIAN, P.C.

24

25

/s/ Steven R. Platt
                                        Steven R. Platt (SBN 245510)

26

27

Attorneys for Defendant MONSANTO COMPANY

28

7

1

## **PROOF OF SERVICE**

2

3       I am employed in the County of Los Angeles, State of California.  I am over the age of 18

4  and not a party to the within action.  My business address is 555 South Flower Street, 30th Floor,

5  Los Angeles, California 90071.

6       On July 8, 2021, I served a true and correct copy of the document described as **ANSWER**

7  **OF MONSANTO COMPANY TO UNVERIFIED DANIELSON COMPLAINT; DEMAND**

8  **FOR JURY TRIAL** on the interested parties, as follows:

9  ☒      By submitting an electronic version of the document via FTP upload to the Court's
         Electronic Filing and Service Provider, One Legal
10

11 ☐      By electronic transfer to Case Anywhere via the Internet, pursuant to the Court's Case
         Management Order No. 2 Authorizing Electronic Service dated March 23, 2018.

12 ☐      By placing a true copy in envelope(s) addressed as referenced below. The envelope(s)
         were then sealed and deposited for collection and mailing in accordance with my
13       employer's normal procedures.  I am readily familiar with the firm's practice for
         collection and processing correspondence for mailing.  Under that practice it would be
14       deposited with the U.S. Postal Service, with all postage prepaid, at Los Angeles,
         California, on the same day in the ordinary course of business.
15

16

17       I declare under penalty of perjury under the laws of the State of California that the

18 foregoing is true and correct, and that this Proof of Service was executed on July 8, 2021 at Los

19 Angeles, California.

20

21                                                    _____
                                                           Lety G. Perez
22

23

24

25

26

27

28

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Steven R. Platt    SBN: 245510 <br> PARKER MILLIKEN CLARK OHARA & SAMUELIAN <br> 555 S. Flower Street, 30th Floor, Los Angeles, CA 90071 <br> TELEPHONE NO.: 213-683-6500    FAX NO.: 213-683-6669 <br> ATTORNEY FOR *(Name):* Defendants Wilbur-Ellis Company, LLC and Wilbur-Ellis Nutrition, LLC | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME: Thomas P. Danielson, et al. v. Monsanto Company, et al.

| **CIVIL CASE COVER SHEET** <br> [X] **Unlimited**  [ ] **Limited** <br> (Amount demanded exceeds $25,000)  (Amount demanded is $25,000 or less) | **Complex Case Designation** <br> [ ] **Counter**  [X] **Joinder** <br> Filed with first appearance by defendant <br> (Cal. Rules of Court, rule 3.402) | CASE NUMBER: <br> CGC-21-591896 |
|---|---|---|
| | | JUDGE: Hon. Garrett L. Wong <br> DEPT: 610 |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[X] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [X] is  [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties       d. [X] Large number of witnesses
   b. [X] Extensive motion practice raising difficult or novel       e. [X] Coordination with related actions pending in one or more courts
       issues that will be time-consuming to resolve           in other counties, states, or countries, or in a federal court
   c. [X] Substantial amount of documentary evidence           f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [X] punitive
4. Number of causes of action *(specify):* 6
5. This case [ ] is  [X] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: July 8, 2021

Steven R. Platt                                                        ▶ /s/ Steven R. Platt
_____                      _____
(TYPE OR PRINT NAME)                                (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 555 South Flower Street, 30th Floor, Los Angeles, California 90071.

On July 8, 2021, I served a true and correct copy of the document described as **CIVIL CASE COVER SHEET** on the interested parties, as follows:

☒ By submitting an electronic version of the document via FTP upload to the Court's Electronic Filing and Service Provider, One Legal

☐ By electronic transfer to Case Anywhere via the Internet, pursuant to the Court's Case Management Order No. 2 Authorizing Electronic Service dated March 23, 2018.

☐ By placing a true copy in envelope(s) addressed as referenced below. The envelope(s) were then sealed and deposited for collection and mailing in accordance with my employer's normal procedures.  I am readily familiar with the firm's practice for collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service, with all postage prepaid, at Los Angeles, California, on the same day in the ordinary course of business.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Proof of Service was executed on July 8, 2021 at Los Angeles, California.

_Lety G. Perez_
Lety G. Perez

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Steven R. Platt (SBN 245510)
PARKER, MILLIKEN, CLARK,
O'HARA & SAMUELIAN, P.C.
555 S. Flower St., 30th Floor
Los Angeles, CA 90071-2440
Telephone: (213) 683-6500
Facsimile: (213) 683-6669
splatt@pmcos.com

Attorneys for Defendants
WILBUR-ELLIS COMPANY LLC and WILBUR-ELLIS NUTRITION, LLC
(formerly known as Wilbur-Ellis Feed, LLC)

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| THOMAS P. DANIELSON, *et al.*, | Case No. CGC-21-591896 |
| Plaintiffs, | **ANSWER OF WILBUR-ELLIS DEFENDANTS TO UNVERIFIED DANIELSON COMPLAINT; DEMAND FOR JURY TRIAL** |
| v. | |
| MONSANTO COMPANY, *et al.*, | |
| Defendants. | Complaint Filed:   May 21, 2021<br>Trial Date:          None Set |

Come now Defendants WILBUR-ELLIS COMPANY LLC and WILBUR-ELLIS NUTRITION, LLC, formerly known as Wilbur-Ellis Feed, LLC (collectively, the "Wilbur-Ellis Defendants") and answer the Complaint of Plaintiffs:

1.    Pursuant to Code of Civil Procedure Section 431.30(d), the Wilbur-Ellis Defendants file their general denial to said Complaint and deny, generally and specifically, each and every allegation of said Complaint, and the whole thereof, and deny that Plaintiffs have sustained or will sustain damage in the sum or sums alleged, or in any sum or amount whatsoever or at all.

2.    Further answering the Complaint, the Wilbur-Ellis Defendants deny that Plaintiffs and/or Decedents sustained or will sustain any injury, damage or loss by reason of any act or omission of the Wilbur-Ellis Defendants.

The Wilbur-Ellis Defendants are informed and believe, and therefore allege the following separate and affirmative defenses:

FIRST DEFENSE

(FAILURE TO STATE A CAUSE OF ACTION – ALL CAUSES OF ACTION)

3.    The Complaint, in whole or part, fails to state a claim or cause of action against the Wilbur-Ellis Defendants upon which relief can be granted.

SECOND DEFENSE

(PRODUCT NOT DEFECTIVE OR UNREASONABLY DANGEROUS – ALL CAUSES OF ACTION)

4.    Plaintiffs' claims against the Wilbur-Ellis Defendants are barred in whole because Plaintiffs cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

THIRD DEFENSE

(LACK OF PROXIMATE CAUSE – ALL CAUSES OF ACTION)

5.    Any alleged negligent or culpable conduct of the Wilbur-Ellis Defendants, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of any injuries allegedly experienced by Plaintiffs and/or Decedents.

<center>FOURTH DEFENSE</center>

<center>(ADEQUATE WARNINGS – ALL CAUSES OF ACTION)</center>

6.      Plaintiffs' claims against the Wilbur-Ellis Defendants are barred, in whole or in part, because the products at issue were designed, manufactured, marketed, and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

<center>FIFTH DEFENSE</center>

<center>(STATUTORY AND REGULATORY COMPLIANCE – ALL CAUSES OF ACTION)</center>

7.      Plaintiffs' claims against the Wilbur-Ellis Defendants are barred, in whole or in part, because the products at issue were not defective or unreasonably dangerous in that they complied with, at all relevant times, all applicable government safety standards.

<center>SIXTH DEFENSE</center>

<center>(FIFRA STATUTORY PREEMPTION – ALL CAUSES OF ACTION)</center>

8.      Plaintiffs' claims against the Wilbur-Ellis Defendants are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling, distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

<center>SEVENTH DEFENSE</center>

<center>(PREEMPTION – CONTINUED EPA APPROVAL – ALL CAUSES OF ACTION)</center>

9.      Plaintiffs' claims against the Wilbur-Ellis Defendants are preempted, in whole or in part, because of findings by the United States Environmental Protection Agency ("U.S. EPA") that glyphosate does not cause cancer in humans and/or because of U.S. EPA-approved product labeling.

<center>EIGHTH DEFENSE</center>

<center>(PRIMARY JURISDICTION – ALL CAUSES OF ACTION)</center>

10.      Plaintiffs' claims against the Wilbur-Ellis Defendants are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

<center>2</center>

## NINTH DEFENSE

### (INDEPENDENT/INTERVENING/SUPERSEDING CAUSES – ALL CAUSES OF ACTION)

11.     Plaintiffs' claims against the Wilbur-Ellis Defendants are barred, in whole or in part, because Decedents' and/or Plaintiffs' injuries, if any, were the result of conduct of Plaintiffs, Decedents, independent third parties, and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to pre-existing medical conditions.

## TENTH DEFENSE

### (RESTATEMENT (SECOND) OF TORTS § 402A, COMMENTS J AND K – ALL CAUSES OF ACTION)

12.     The doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar Plaintiffs' claims against the Wilbur-Ellis Defendants in whole or in part.

## ELEVENTH DEFENSE

### (STATUTE OF LIMITATIONS AND/OR REPOSE – ALL CAUSES OF ACTION)

13.     Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations including, but not limited to, Code of Civil Procedure sections 335.1 and 340.8.

## TWELFTH DEFENSE

### (MISUSE OR FAILURE TO FOLLOW INSTRUCTIONS – ALL CAUSES OF ACTION)

14.     The misuse or abnormal use of the product or failure to follow instructions bar Plaintiffs' claims against the Wilbur-Ellis Defendants in whole or in part.

## THIRTEENTH DEFENSE

### (ALTERNATIVE CAUSES – ALL CAUSES OF ACTION)

15.     If Plaintiffs and/or Decedents suffered injury or damages as alleged, which is denied, such injury or damages resulted from: (a) acts or omissions of persons or entities for which the Wilbur-Ellis Defendants are neither liable nor responsible or, in the alternative, the Wilbur-Ellis Defendants are entitled to an assessment of the relative degree of fault of all such

3

persons and entities; or (b) resulted from diseases and/or causes that are not related or connected with any product sold, distributed, or manufactured by the Wilbur-Ellis Defendants. Such acts or omissions on the part of others or diseases or causes constitute an independent, intervening and sole proximate cause of Plaintiffs' and/or Decedents' alleged injury or damages.

FOURTEENTH DEFENSE

(LACK OF PRIVITY; NO DUTY – ALL CAUSES OF ACTION)

16.    The Wilbur-Ellis Defendants had no legal relationship or privity with Plaintiffs and/or Decedents and owed no duty to Plaintiffs and/or Decedents by which liability could be attributed to them.

FIFTEENTH DEFENSE

(COMMERCIAL FREE SPEECH – ALL CAUSES OF ACTION)

17.    Plaintiffs' claims against the Wilbur-Ellis Defendants are preempted or otherwise barred in whole or in part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution and Article I, Section 2 of the California Constitution.

SIXTEENTH DEFENSE

(PUNITIVE DAMAGES UNCONSTITUTIONAL – ALL CAUSES OF ACTION)

18.    Plaintiffs' claims against the Wilbur-Ellis Defendants for punitive damages are barred because such an award would violate the Wilbur-Ellis Defendants' due process, equal protection and other rights under the United States Constitution, the California Constitution, and/or other applicable state constitutions – and would be improper under the common law and public policies of the United States, the laws of California and/or other states' laws.

SEVENTEENTH DEFENSE

(CONDUCT DOES NOT WARRANT PUNITIVE DAMAGES – ALL CAUSES OF ACTION)

19.    Plaintiffs' claims against the Wilbur-Ellis Defendants for punitive damages are barred because Plaintiffs have failed to allege conduct warranting imposition of punitive damages under California and/or other applicable state laws.

<div align="center">

EIGHTEENTH DEFENSE

(PUNITIVE DAMAGES BARRED OR LIMITED BY OPERATION OF LAW– ALL CAUSES

OF ACTION)

</div>

20.     Plaintiffs' claims against the Wilbur-Ellis Defendants for punitive damages are barred and/or limited by operation of state and/or federal law.

<div align="center">

NINETEENTH DEFENSE

(CONTRIBUTORY/COMPARATIVE NEGLIGENCE – ALL CAUSES OF ACTION)

</div>

21.     Plaintiffs' claims against the Wilbur-Ellis Defendants are barred in whole or in part by Plaintiffs' and/or Decedents' contributory/comparative negligence.

<div align="center">

TWENTIETH DEFENSE

(FAILURE TO MITIGATE DAMAGES – ALL CAUSES OF ACTION)

</div>

22.     Plaintiffs' claims against the Wilbur-Ellis Defendants are barred in whole or in part by Plaintiffs' and/or Decedents' failure to mitigate damages.

<div align="center">

TWENTY-FIRST DEFENSE

(SOPHISTICATED USER DOCTRINE – ALL CAUSES OF ACTION)

</div>

23.     Plaintiffs' claims against the Wilbur-Ellis Defendants are barred in whole or in part by the sophisticated user doctrine.

<div align="center">

TWENTY-SECOND DEFENSE

(COLLATERAL SOURCE – ALL CAUSES OF ACTION)

</div>

24.     To the extent that Decedents and/or Plaintiffs recovered payments for Plaintiffs' alleged injuries from any collateral source(s) or other source(s), Plaintiffs' recovery in this lawsuit, if any, shall be reduced to the extent allowed by applicable law.

<div align="center">

TWENTY-THIRD DEFENSE

(ALLEGED INJURIES NOT CAUSED BY WILBUR-ELLIS PRODUCT – ALL CAUSES

OF ACTION)

</div>

25.     If Plaintiffs and/or Decedents have been injured or damaged, no injury or damages being admitted, such injuries or damages were not caused by a product of the Wilbur-Ellis Defendants.

<div align="center">

5

</div>

TWENTY-FOURTH DEFENSE

(MISJOINDER OF PARTIES – ALL CAUSES OF ACTION)

26.     Plaintiffs' claims are barred, in whole or in part, because some or all of the parties have been improperly joined in this action.

TWENTY-FIFTH DEFENSE

(INCONVENIENT VENUE – ALL CAUSES OF ACTION)

27.     Venue is or may be inconvenient for some or all of Plaintiffs' claims.

TWENTY-SIXTH DEFENSE

(FRAUD ON FEDERAL AGENCY PREEMPTION – ALL CAUSES OF ACTION)

28.     Any claims based on allegations that the Wilbur Ellis Defendants misled, defrauded, made misrepresentations to, or withheld information from the U.S. EPA are preempted by federal law. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001); *Nathan Kimmel, Inc. v. Dowelanco*, 275 F.3d 1199 (9th Cir. 2002).

TWENTY-SEVENTH DEFENSE

(NO INVOLVEMENT WITH ROUNDUP®-BRANDED HERBICIDES – ALL CAUSES OF ACTION ASSERTED AGAINST WILBUR-ELLIS NUTRITION, LLC)

29.     Plaintiffs' claims against Wilbur-Ellis Nutrition, LLC are barred because Wilbur-Ellis Nutrition, LLC has never designed, manufactured, distributed, or sold Roundup®-branded herbicides (or any other herbicides).

TWENTY-EIGHTH DEFENSE

(LACK OF COMPANY EXISTENCE – ALL CAUSES OF ACTION ASSERTED AGAINST WILBUR-ELLIS NUTRITION, LLC)

30.     To the extent that Plaintiffs' and/or Decedents' exposure to Roundup®-branded herbicides ended before September 2015, Plaintiffs do not have viable claims against Wilbur-Ellis Nutrition, LLC because Wilbur-Ellis Nutrition, LLC did not come into existence as a company until September 2015.

1

<p style="text-align:center">TWENTY-NINTH DEFENSE</p>

2

<p style="text-align:center">(RELIEF SOUGHT BASED ON OTHER STATES' LAWS – ALL CAUSES OF ACTION)</p>

3    31.    Plaintiffs' claims against the Wilbur-Ellis Defendants are barred to the extent that

4    Plaintiffs seek relief under the laws of states that do not govern Plaintiffs' claims.

5

<p style="text-align:center">THIRTIETH DEFENSE</p>

6

<p style="text-align:center">(PUNITIVE DAMAGES BARRED – WRONGFUL DEATH CAUSE OF ACTION)</p>

7    32.    To the extent Plaintiffs assert a wrongful death cause of action, Plaintiffs' request

8    for punitive damages is barred because punitive damages are not available under California law

9    for a wrongful death cause of action.

10

<p style="text-align:center">THIRTY-FIRST DEFENSE</p>

11

<p style="text-align:center">(RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES – ALL CAUSES OF</p>

12

<p style="text-align:center">ACTION)</p>

13    33.    The Wilbur-Ellis Defendants hereby give notice that they intend to rely upon such

14    other defenses as may become available or apparent during the course of discovery and thus

15    reserve their right to amend this Answer to assert such defenses.

16    WHEREFORE, the Wilbur-Ellis Defendants pray as follows:

17    1.    That Plaintiffs take nothing by way of the Complaint;

18    2.    That the Complaint be dismissed, in its entirety with prejudice;

19    3.    That the Wilbur-Ellis Defendants be awarded judgment in this action;

20    4.    That the Wilbur-Ellis Defendants be awarded costs of suit;

21    5.    That the Wilbur-Ellis Defendants be awarded such other and further relief as

22    the Court deems just and proper.

23    Dated:  July 8, 2021                PARKER, MILLIKEN, CLARK, O'HARA &
                                          SAMUELIAN, P.C.
24

25                                        /s/ Steven R. Platt
                                          Steven R. Platt (SBN 245510)
26
                                          Attorneys for Defendants WILBUR-ELLIS COMPANY
27                                        LLC and WILBUR-ELLIS NUTRITION, LLC
                                          (formerly known as Wilbur-Ellis Feed, LLC)
28

<p style="text-align:center">7</p>

<p style="text-align:center">WILBUR-ELLIS DEFENDANTS' ANSWER TO COMPLAINT</p>

1

**DEMAND FOR JURY TRIAL**

2         Defendants WILBUR-ELLIS COMPANY LLC and WILBUR-ELLIS NUTRITION, LLC

3   (formerly known as Wilbur-Ellis Feed, LLC) hereby demand a jury trial in the above-entitled

4   action.

5     Dated:  July 8, 2021             PARKER, MILLIKEN, CLARK, O'HARA &
                             SAMUELIAN, P.C.

6

7                            /s/ Steven R. Platt
                         Steven R. Platt (SBN 245510)

8

9                            Attorneys for Defendants WILBUR-ELLIS COMPANY
                         LLC and WILBUR-ELLIS NUTRITION, LLC

10                            (formerly known as Wilbur-Ellis Feed, LLC)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WILBUR-ELLIS DEFENDANTS' ANSWER TO COMPLAINT

## **PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 555 South Flower Street, 30th Floor, Los Angeles, California 90071.

On July 8, 2021, I served a true and correct copy of the document described as **ANSWER OF WILBUR-ELLIS DEFENDANTS TO UNVERIFIED DANIELSON COMPLAINT; DEMAND FOR JURY TRIAL** on the interested parties, as follows:

☒ By submitting an electronic version of the document via FTP upload to the Court's Electronic Filing and Service Provider, One Legal

☐ By electronic transfer to Case Anywhere via the Internet, pursuant to the Court's Case Management Order No. 2 Authorizing Electronic Service dated March 23, 2018.

☐ By placing a true copy in envelope(s) addressed as referenced below. The envelope(s) were then sealed and deposited for collection and mailing in accordance with my employer's normal procedures.  I am readily familiar with the firm's practice for collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service, with all postage prepaid, at Los Angeles, California, on the same day in the ordinary course of business.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Proof of Service was executed on July 8, 2021 at Los Angeles, California.

_____
Lety G. Perez

1  **Robert K. Phillips – 135088**
   **Gabriela M. Vasquez – 337324**
2  PHILLIPS, SPALLAS & ANGSTADT LLP
   560 Mission Street, Suite 1010
3  San Francisco, California   94105
   Telephone: (415) 278-9400
4  Facsimile: (415) 278-9411

5  *Attorneys for Defendant*
   *Walmart Inc.*

6

7

8                SUPERIOR COURT OF CALIFORNIA

9      IN AND FOR THE COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

10  THOMAS P. DANIELSON, an                  Case No. CGC-21-591896
    individual; NAHID ASHTARI, an
11  individual; TIFFANI BALLEW, an individual;   **DEFENDANT, WALMART INC'S ANSWER**
    BRANDFORD STROHMAIER, an individual;   **TO PLAINTIFFS' COMPLAINT**
12  BARBARA ANN KORTES, an individual;
    DAVIDSON SMITH, an individual; DONNA
13  MARSHALL, surviving next of kin and personal   **JURY DEMANDED**
    representative of the ESTATE OF DECEDENT
14  ALLEN E. MARSHALL; RENEE NIELSEN, an
    individual; RODNEY CATALANO an
15  individual; KAREN HALLETT surviving next
    of kin and personal representative of the
16  ESTATE OF DECEDENT HONORE
    HEDLUND; BARBARA HAGAN, an
17  individual; LOWELL STONE, an individual;
    MICHELE MYERS, an individual; JONATHAN
18  MYERS, surviving next of kin and personal
    representative of the ESTATE OF DECEDENT
19  RONALD MYERS; LISA FROMME, an
    individual; LEE MARX, an individual; STEVE
20  BIDEGAIN, an individual; ELIZABETH ANN
    KULINSKI-VETTING, an individual;
21  KRYSTAL THORP, an individual; JOAN
    BENNETT, an individual; BRENDAN EVANS,
22  an individual; MARY MINNIEWEATHER,
    surviving next of kin and personal representative
23  of the ESTATE OF DECEDENT DELL
    MINNIEWEATHER; CAROL WEBB, an
24  individual; FLORA JOHNSON, an individual;
    NANCY JORGENSEN, an individual; DON
25  WILLIAMS, surviving next of kin and personal
    representative of the ESTATE OF DECEDENT
26  SALLY A. GONZALEZ; MARY LOUISE
    JORDAN, an individual; HAGOP TERZIAN, an
27  individual; JAMES BARMBY, an individual;

28

1   DAVID THOMAS, an individual; ANTHONY
    SEMONI, an individual; STEPHANIE
2   SHEPPARD, an individual; PAUL DELANEY,
    an individual; PERLA GAK, an individual;
3   DESIREE PACHECO, an individual; ANDREW
4   NIETO, an individual; DAVID HASKELL
    surviving next of kin and personal representative
5   of the ESTATE OF DECEDENT JIMMIE
    HASKELL; KATHERINE WRIGHT, surviving
6   next of kin and personal representative of the
    ESTATE OF DECEDENT CAROL BAKER;
7   JUDY CALCAGNO surviving next of kin and
8   personal representative of the ESTATE OF
    DECEDENT JOSEPH CALCAGNO; VANCE
9   MARSHALL surviving next of kin and personal
    representative of the ESTATE OF DECEDENT
10  JOHNNY SAXTON; DANIEL WHANG, an
11  individual; BRUCE ANACKER, an
    individual; LISA MURRAY, an
12  individual; JOSEFINA MANIAGO, an
    individual; JESSE GARCIA, an individual;
13  KALVIN CHAUNCY surviving next of kin and
14  personal representative of the ESTATE OF
    DECEDENT KALVIN CHAUNCY, JR.;
15  REBECCA THOMPSON, an individual;
    JAMES P. WILSON, an individual;
16  TIMOTHY TULLIO, an individual; CAROL
    REEVE surviving next of kin and personal
17  representative of the ESTATE OF DECEDENT
18  MICHAEL REEVE; LUCILLE BOXELL
    surviving next of kin and personal representative
19  of the ESTATE OF DECEDENT RICHARD
    BOXELL; BECKY PEARSON, an individual;
20  LINDA B. PATTI surviving next of kin and
    personal representative of the ESTATE OF
21  DECEDENT FRANK PATTI; SCOTT
22  FERGUSON surviving next of kin and personal
    representative of the ESTATE OF DECEDENT
23  MARI GWENDOLYN FERGUSON;
    ALEJANDRA AVILA-AVILES, an individual;
24  MARY PAGLIONE surviving next of kin and
    personal representative of the ESTATE OF
25  DECEDENT MARY STEVENS; KATIE
26  RAMIREZ, an individual; RON WALTON, an
    individual; THOMAS JOHN RAYMOND, an
27  individual; BERNADETTE BONHIVERT, an
    individual; CAROL CLAWSON, an individual;
28

1   ROB STEWART surviving next of kin and
    personal representative of the ESTATE OF
2   DECEDENT ROCKY STEWART;
    FREDERICK F. WARMUTH, an individual;
3   BRADLEY RYAN STUCK, an individual;
4   MARY RUBENKING surviving next of kin and
    personal representative of the ESTATE OF
5   DECEDENT CARL RUBENKING; DENNY
    EDLIN surviving next of kin and personal
6   representative of the ESTATE OF
    DECEDENT GEORGE EDLIN; RONALD
7   LYSIK, an individual; RACHAEL PESSAH-
    SUTHERLAND, an individual;
8

9           Plaintiffs,

10      v.

11   MONSANTO COMPANY, a corporation;
     WILBUR-ELLIS COMPANY, LLC, a limited
12   liability company; WILBUR-ELLIS
     NUTRITION, LLC (formerly WILBUR-ELLIS
13   FEED, LLC); HOME DEPOT PRODUCT
     AUTHORITY, LLC; WALMART, INC.;
14   LOWE'S COMPANIES,
     INC.; PIONEER HOME CENTER, INC.;
15   ORCHARD SUPPLY HARDWARE;
     MEINERS OAKS HARDWARE, INC.;
16   HYDRO SCAPE PRODUCTS, INC.;
     BUILDERS MART TRUE VALUE
17   HARDWARE; MARK STEVEN'S NURSERY;
     KMART CORPORATION; SPADLIN, INC.;
18   PLACERVILLE FRUIT GROWERS
     INCORPORATED; LUCKY STORES, INC.
19   and DOES 1 through 100, et al.

20          Defendants.

21

22      COMES NOW Defendant WALMART INC. (hereinafter "Walmart" or "Defendant") and

23   answers the Complaint filed by Plaintiffs THOMAS P. DANIELSON, et al. (hereinafter "Plaintiffs")

24   herein for itself and no other party as follows: Defendant generally and specifically denies each and

25   every, all and singular, allegation contained in the Complaint and in each cause of action therein.

26   Defendant denies that Defendant is liable or obligated to Plaintiffs in any amount or amounts at all.

27   Defendant further denies that Plaintiffs sustained damages in the sum or sums alleged, or in any other

28   sum or sums, or at all, by reason of any act, breach or omission on the part of Defendant or of

1   Defendant's agents or employees, if any.

2

3   ### FIRST AFFIRMATIVE DEFENSE

4   Defendant alleges that the Complaint fails to state facts sufficient to constitute a cause of

5   action against Defendant upon which relief may be granted

6   ### SECOND AFFIRMATIVE DEFENSE

7   Defendant alleges that the Complaint is barred by the applicable statute of limitations, pursuant

8   to Code of Civil Procedure sections 335.1, 337, 337.15, 337.2, 338, 339, 339.5, 340, 340.4 and/or 343

9   and Labor Code sections 3852, 3853, et seq.

10  ### THIRD AFFIRMATIVE DEFENSE

11  Defendant denies that they were negligent in any fashion with respect to the damages, losses,

12  injuries and debts claimed by Plaintiffs in the Complaint on file herein; however, if Defendant is

13  found to be negligent (which supposition is denied and merely stated for the purpose of this

14  affirmative defense), then Defendant provisionally alleges that their negligence is not the sole and

15  proximate cause of the resultant damages, losses and injuries alleged by Plaintiffs and that the

16  damages awarded to Plaintiffs, if any, be apportioned according to the respective fault of the parties,

17  persons, and entities, or their agents, servants, and employees who contributed to and/or caused said

18  resultant damages as alleged, according to the proof presented at the time of trial.  That to assess any

19  greater percentage of fault and damages against Defendant in excess of its percentage of fault would

20  be a denial of Federal equal protection and due process, all guaranteed by the Constitution.

21  ### FOURTH AFFIRMATIVE DEFENSE

22  Defendant contends that the injuries and damages complained of by Plaintiffs, were either

23  wholly or in part proximately caused by negligence or other wrongful acts or omissions of persons or

24  entities other than Defendant, and that said negligence or wrongful acts or omissions either are imputed

25  to Plaintiffs by reason of their relationship with said persons or entities, or comparatively reduce the

26  proportion of negligence and corresponding liability of Defendant, if any, which liability is specifically

27  denied.

28  ### FIFTH AFFIRMATIVE DEFENSE

Defendant contends that Plaintiffs knew, or in the exercise of reasonable care, should have known of the risks and hazards involved in the undertaking in which they engaged, but nevertheless and with full knowledge of these things, did fully and voluntarily consent to assume the risks and hazards involved in the undertaking.

## SIXTH AFFIRMATIVE DEFENSE

Defendant contends that the events, injuries, losses, and damages complained of by Plaintiffs were the result of an unavoidable accident, insofar as Defendant is concerned and occurred without any negligence, want of care, default or other breach of duty to Plaintiffs on the part of Defendant.

## SEVENTH AFFIRMATIVE DEFENSE

Defendant contends that the product referred to in the Complaint was misused in a manner which was not reasonably foreseeable and that such abuse proximately contributed to the happening of the incident and to the injuries, loss, and damage complained of.

## EIGHTH AFFIRMATIVE DEFENSE

Defendant contends that prior to and at the time of the loss and damages complained of, the product referred to in the Complaint was modified, altered and/or tampered with in a manner that was not reasonably foreseeable and unknown to the Defendant; that such unknown modification, alteration and/or tampering proximately contributed to the injuries and damages sustained by Plaintiffs, and bars Plaintiffs' recovery herein.

## NINTH AFFIRMATIVE DEFENSE

Defendant contends any recovery on the Complaint, or any claim for relief averred therein, is barred to the extent that Defendant owed no duty to Plaintiffs.

## TENTH AFFIRMATIVE DEFENSE

Defendant contends that each and every cause of action or purported cause of action contained in the Complaint is barred by the Doctrine of Collateral Estoppel.

## ELEVENTH AFFIRMATIVE DEFENSE

Defendant contends that if any product at issue was sold by Defendant and any unsafe or dangerous condition existed with such product, Defendant had no notice, either actual or constructive, of the existence of such unsafe or dangerous condition.

### TWELFTH AFFIRMATIVE DEFENSE

Defendant contends that Plaintiffs' Complaint is barred, in whole or in part, because the utility and/or benefit of the product outweighed the alleged risks of danger, if any there were.

### THIRTEENTH AFFIRMATIVE DEFENSE

Defendant contends that Plaintiffs' Complaint is barred, in whole or in part, because the product performed as safely as an ordinary consumer would expect.

### FOURTEENTH AFFIRMATIVE DEFENSE

Defendant contends the Plaintiffs' Complaint is barred, in whole or in part, because the product was not defective when it left the control of Defendant.

### FIFTEENTH AFFIRMATIVE DEFENSE

Defendant contends the Plaintiffs' Complaint, and each and every purported cause of action asserted against Defendant is barred, in whole or in part, because at all times relevant hereto, to the extent required, adequate warnings and/or instructions were provided.

### SIXTEENTH AFFIRMATIVE DEFENSE

Defendant contends that it is not responsible for any alleged harm or damages because the user of the product was a sophisticated user.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Defendant contends Plaintiffs' breach of warranty claim is barred, in whole or in part, because Defendant did not make any warranties, express or implied, to Plaintiffs with respect to the subject product or any of its component parts, to the extent that the alleged representations or warranties were made, they were made by persons or entities other than Defendant, and over whom Defendant has or had no control or right of control.

. . .

### EIGHTEENTH AFFIRMATIVE DEFENSE

Defendant contends Plaintiffs' breach of warranty claim is barred because Plaintiffs did not rely upon any warranty from Defendant. To the extent Plaintiffs relied upon any alleged representation or warranties, such reliance was unjustified.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiffs' right to recover, if any, is limited to or precluded by the warranty provisions, including limitations and disclaimer provisions, in Defendant' contract(s), and/or documents relating thereto.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiffs' warranty claims are barred by the expiration of any warranty given express or implied.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Defendant contends that Plaintiffs were not in privity of contract with Defendant and therefore cannot rely upon any cause of action for breach of express or implied warranty and/or contract.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Defendant contends the injuries, loss, and damage sustained by Plaintiffs were not proximately caused by any act or omission by Defendant but were attributable to the acts or omissions of others over whom Defendant had no control and for whom Defendant had no responsibility.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Defendant contends that the injuries, loss, and damage sustained by Plaintiffs were the result of an independent intervening and/or superseding cause which bars and/or diminishes Plaintiffs' recovery.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Defendant contends they are entitled to indemnification and/or a defense, either in whole or in part, from all persons or entities whose negligence and/or fault proximately contributed to the injuries, loss, and damage sustained by Plaintiffs. Defendant hereby reserve the right to pursue and settle any and all indemnity and/or defense claims it may have in this action, including declaratory relief.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

1   Defendant contends that each and every cause of action or purported cause of action contained

2   in the Complaint is barred by the Doctrine of Laches.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

4   Defendant assert that Plaintiffs' damages, if any, are speculative, uncertain, and not capable of

5   being determined by a trier of fact.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE

7   Defendant contends that it is entitled to a set-off and/or reduction in any verdict and/or

8   judgment rendered against it in an amount equivalent to the collateral benefits and/or settlement monies

9   paid to or on behalf of Plaintiffs.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE

11   Defendant contends that Plaintiffs have misjoined or failed to join all potentially responsible

12   parties necessary and indispensable to this action.

### TWENTY-NINTH AFFIRMATIVE DEFENSE

14   Defendant contends that the liability of Defendant for the non-economic damages claimed or

15   proven by Plaintiffs shall be and is limited by California Civil Code § 1431.2 regarding joint and

16   several liability.

### THIRTIETH AFFIRMATIVE DEFENSE

18   Defendant contends Plaintiffs' claim for punitive damages against Defendant cannot be

19   sustained because any award of punitive damages would violate Defendant's Due process rights under

20   the Fourteenth Amendment to the United States Constitution as well as the California Constitution.

### THIRTY-FIRST AFFIRMATIVE DEFENSE

22   Defendant contends Plaintiffs' recovery for past medical expenses or other economic loss or

23   benefit, if any, is limited to the lesser of the amount paid or the reasonable value of those services or

24   benefits.  *Howell v. Hamilton Meats*, 52 Cal.4th 541 (2011).

### THIRTY-SECOND AFFIRMATIVE DEFENSE

26   Defendant contends Plaintiffs are excluded from recovering any amounts which have been, or

27   will, indemnify Plaintiffs, for any past or future claimed medical expenses, health care, life care, or

28

1  other economic loss or benefit that is offered, or provided under or in connection with the Patient

2  Protection and Affordable Care Act and Plaintiff will therefore be limited to the reasonable value, if

3  any, of future medical services available to them under the Affordable Care Act.

### THIRTY-THIRD AFFIRMATIVE DEFENSE

4

5      Defendant contends that Plaintiffs failed to take reasonable steps to avail themselves of the

6  resources, service benefits, and coverage available under the Patient Protection and Affordable Care

7  Act, Plaintiffs have failed to mitigate their damages and cannot recover for such a failure.

### THIRTY-FOURTH AFFIRMATIVE DEFENSE

8

9      Defendant contends the product(s) at issue were in compliance with all applicable

10  international, federal, state, local, and industry codes, standards, regulations, specifications, and

11  statutes regarding the manufacture, sale, and use of the product(s) at all times pertinent to this action.

### THIRTY-FIFTH AFFIRMATIVE DEFENSE

12

13      Defendant contends Plaintiffs' claims are barred because the subject product(s) were not

14  defective or unreasonably dangerous and were in compliance with all applicable government safety

15  standards.

### THIRTY-SIX AFFIRMATIVE DEFENSE

16

17      Defendant alleges that, at all times material hereto, the Plaintiffs were under an affirmative

18  duty to exercise due care in their own regard but, notwithstanding said duty, so negligently and

19  carelessly conducted themselves in the use of said product that their conduct was the sole proximate

20  cause of or a contributing cause to the events of which they now complain. The Plaintiff's right to

21  recovery is, therefore, defeated or diminished as a result of said conduct under the Doctrine of

22  Comparative Negligence.

### THIRTY-SEVEN AFFIRMATIVE DEFENSE

23

24      If a condition of the product existed of the type alleged by the Plaintiffs, which is expressly

25  denied, that condition was such that it and the risks thereof (if any) were not hidden or unknown to the

26  Plaintiffs but were or should have been immediately obvious and discernable to the Plaintiffs. Said

27  open and obvious dangers negate any duty to warn of the Defendant.

28

## THIRTY-EIGHTH AFFIRMATIVE DEFENSE

At no time prior to the sale of the product alleged by the Plaintiff did the Defendant have knowledge of any defects or any conditions in the subject product of the type alleged by the Plaintiff or otherwise. In addition, under the circumstances, the Defendant should not have reason to know of any such alleged defects or conditions the existence of which is denied.

## THIRTY-NINTH AFFIRMATIVE DEFENSE

Defendant alleges that Plaintiffs did not reasonably rely, to his detriment or harm, upon any statement or representation by Defendant, and further alleges that no statement or representation by Defendant was a substantial factor in causing Plaintiffs' harm, if any.

## FORTIETH AFFIRMATIVE DEFENSE

Defendants are not liable to Plaintiff for punitive damages because neither Defendants nor any of its officers, directors, or managing agents committed any alleged oppressive, fraudulent, or malicious acts; authorized or ratified any such acts; had advance knowledge of the unfitness, if any, of the employee or employees, if any, who allegedly committed such acts; or employed any such employee or employees with a conscious disregard of the rights or safety of others, as required by California Civil Code section 3294(b).

## FORTY-FIRST AFFIRMATIVE DEFENSE

If any products allegedly sold by Defendant were used by Plaintiffs at any time relevant hereto, the amount of use by Decedent was of such a minor, trivial or insignificant amount, that no reasonable person would conclude that Defendant had contributed to any of the damages or injuries alleged in the Complaint.

## FORTY-SECOND AFFIRMATIVE DEFENSE

Defendant contends that they presently have insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, defenses available. Defendant reserves the right to amend this Answer to assert additional defenses in the event discovery indicates that they would be appropriate.

1

## FORTY-THIRD AFFIRMATIVE DEFENSE

2

3

Defendant contends that there is a misjoinder of defendants each of each has allegedly engaged in separate unrelated transactions with Plaintiffs and that claims asserted herein and/or defendants named herein should be severed and proceeded with separately.

4

5

6

WHEREFORE, Defendant prays for judgment against Plaintiffs as follows:

7

      1.     That Plaintiffs take nothing by the Complaint;

8

      2.     For dismissal of this action, with prejudice;

9

      3.     For attorneys' fees, costs, and expert witness fees incurred in defense of this action; and

10

      4.     For such other, further relief, as this Court may deem just and proper.

11

12

DATED:  July 8, 2021               Respectfully submitted,

13

**PHILLIPS, SPALLAS & ANGSTADT LLP**

14

15

By:       _____

16

Robert K. Phillips
Gabriela M. Vasquez
*Attorneys for Defendant Walmart Inc.*

17

18

19

20

21

22

23

24

25

26

27

28

1   JOSHUA S. GOODMAN – State Bar #116576
    RUTA PASKEVICIUS – State Bar #127784
2   GOODMAN NEUMAN HAMILTON LLP
    One Post Street, Suite 2100
3   San Francisco, CA  94104
    Telephone: (415) 705-0400
4   Facsimile: (415) 705-0411

5   Attorneys for Defendant
    HOME DEPOT PRODUCT AUTHORITY, LLC
6

7

8                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                     **FOR THE COUNTY OF SAN FRANCISCO**
9

10

11   THOMAS P. DANIELSON; AN                    **Case No. CGC-21-591896**
     INDIVIDUAL; NAHID ASHTARI, AN
12   INDIVIDUAL; TIFEANI BALLEW, AN
     INDIVIDUAL; BRANDFORD                      **HOME DEPOT PRODUCT**
13   STROHMAIER, AN INDIVIDUAL;                 **AUTHORITY, LLC'S ANSWER TO**
     BARBARA ANN KORTES, AN                     **ORIGINAL COMPLAINT AND**
14   INDIVIDUAL; DAVIDSON SMITH, AN             **DEMAND FOR JURY TRIAL**
     INDIVIDUAL; DONNA MARSHALL
15   *SURVIVING NEXT OF KIN AND*
     *PERSONAL REPRESENTATIVE OF THE*
16   *ESTATE OF DECEDENT* ALLEN E.
     MARSHALL; RENEE NIELSEN, AN
17   INDIVIDUAL; RODNEY CATALANO,
     AN INDIVIDUAL KAREN HALLETT
18   SURVIVING NEXT OF KIN AND
     PERSONAL REPRESENTATIVE OF
19   THE ESTATE OF DECEDENT HONORE
     HEDLUND; BARBARA HAGAN, AN
20   INDIVIDUAL; LOWELL STONE, AN
     INDIVIDUAL; MICHELE MYERS, AN
21   INDIVIDUAL; JONATHAN MYERS
     *SURVIVING NEXT OF KIN AND*
22   *PERSONAL REPRESENTATIVE OF THE*
     *ESTATE OF DECEDENT* RONALD
23   MYERS; LISA FROMME, AN
     INDIVIDUAL; LEE MARX AN
24   INDIVIDUAL; STEVE BIDEGAIN, AN
     INDIVIDUAL; ELIZABETH ANN

25

26

27

28

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

-1-
ANSWER TO COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KUIANSKI-VETTING, AN
INDIVIDUAL KRYSTAL THORP, AN
INDIVIDUAL JOAN BENNETT, AN
INDIVIDUAL; BRENDA EVANS, AN
INDIVIDUAL MARY
MINNIEWEATHER SURVIVING NEXT
OF KIN AND PERSONAL
REPRESENTATIVE OF THE ESTATE
OF DECEDENT DELL
MINNIEWEATHER; CAROL WEBB,
AN INDIVIDUAL; FLORA JOHNSON,
AN INDIVIDUAL; NANCY
JORGENSEN; AN INDIVIDUAL; DON
WILLIAMS SURVIVING NEXT OF KIN
AND PERSONAL REPRESENTATIVE
OF THE ESTATE OF DECEDENT
SALLY A GONZALEZ; MARY LOUISE
JORDAN, AN INDIVIDUAL; HAGOP
TERZIAN, AN INDIVIDUAL; JAMES
BARMBY, AN INDIVIDUAL; DAVID
THOMAS, AN INDIVIDUAL;
ANTHONY SEMONI, AN INDIVIDUAL
STEPHANIE SHEPPARD, AN
INDIVIDUAL; PAUL DELANEY, AN
INDIVIDUAL; PERLA GAK, AN
INDIVIDUAL; DESIREE PACHECO, AN
INDIVIDUAL; ANDREW NIETO, AN
INDIVIDUAL; DAVID HASKELL
SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF
THE ESTATE OF DECEDENT JIMMIE
HASKELL; KATHERINE WRIGHT
SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF
THE ESTATE OF DECEDENT CAROL
BAKER; JUDY CALCAGNO
SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF
THE ESTATE OF DECEDENT JOSEPH
CALCAGNO; VANCE MARSHALL IS A
RESIDENT OF CALIFORNIA AND IS
THE SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF
THE ESTATE OF DECEDENT JOHNNY

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

ANSWER TO COMPLAINT

SAXTON; DANIEL WHANG; AN INDIVIDUAL; BRUCE ANACKER, AN INDIVIDUAL; LISA MURRAY, AN INDIVIDUAL; JOSEFINA MANIAGO, AN INDIVIDUAL; JESSE GARCIA, AN INDIVIDUAL; KAIVIN CHAUNCY SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT KALVIN CHAUNCY, JR.; REBECCA THOMPSON, AN INDIVIDUAL; JAMES P. WILSON AN INDIVIDUAL; TIMOTHY TULLAO, AN INDIVIDUAL; CAROL REEVE SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT MICHAEL REEVE; LUCILLE BOXELL SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT RICHARD BOXELL BECKY PEARSON; AN INDIVIDUAL; LINDA B. PATTI SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT FRANK PATTI; SCOTT FERGUSON SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT MARI GWENDOLYN FERGUSON; ALEJANDRA AVILA-AVILES AN INDIVIDUAL; MARY PAGLIONE SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF THE ESTATE OF DECEDENT MARY STEVENS; KATIE RAMIREZ, AN INDIVIDUAL: RON WALTON, AN INDIVIDUAL; THOMAS JOHN RAYMOND, AN INDIVIDUAL; BERNADETTE BONHIVERT, AN INDIVIDUAL; CAROL CLAWSON AN INDIVIDUAL; ROB STEWART SURVIVING NEXT OF KIN AND PERSONAL REPRESENTATIVE OF

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

-3-

ANSWER TO COMPLAINT

THE ESTATE OF DECEDENT ROCKY
STEWART; FREDERICK F.
WARMUTH, AN INDIVIDUAL;
BRADLEY RYAN STUCK, AN
INDIVIDUAL; MARY RUBENKING
SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF
THE ESTATE OF DECEDENT CARL
RUBENKING; DENNY EDLIN
SURVIVING NEXT OF KIN AND
PERSONAL REPRESENTATIVE OF
THE ESTATE OF DECEDENT GEORGE
EDLIN; RONALD LYSIK, AN
INDIVIDUAL; RACHAEL PESSAH-
SUTHERLAND; AN INDIVIDUAL;

Plaintiffs,

v.

MONSANTO COMPANY, a corporation;
WILBUR-ELLIS COMPANY, LLC; a
limited liability company; WILBUR-
ELLIS NUTRITION, LLC (formerly
WILBUR-ELLIS FEED, LLC); HOME
DEPOT PRODUCT AUTHORITY, LLC;
WALMART INC.; LOWE'S
COMPANIES, INC.; PIONEER HOME
CENTER, INC.; ORCHARD SUPPLY
HARDWARE; MEINERS OAKS
HARDWARE, INC.; HYDRO SCAPE
PRODUCTS INC.; BUILDERS MART
TRUE VALUE HARDWARE; MARK
STEVEN'S NURSERY, KMART
CORPORATION; SPRADLIN, INC.;
PLACERVILLE FRUIT GROWERS
INCORPORATED; LUCKY STORES,
INC. and DOES 1 through 100, et al.

Defendants.

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

-4-
ANSWER TO COMPLAINT

Defendant HOME DEPOT PRODUCT AUTHORITY, LLC (hereinafter "Defendant"), pursuant to Code of Civil Procedure Section 431.30(d), in answer to the unverified Complaint of Plaintiffs, denies each and every, all and singular, allegations of the Complaint, and denies that Plaintiffs have been injured or damaged in any of the sums mentioned in the Complaint, or in any sum, at all, as the result of any act or omission of this answering Defendant.

In addition to the general denial, Defendant asserts the following affirmative defenses.

## FIRST AFFIRMATIVE DEFENSE

### Lack of Personal Jurisdiction

This answering Defendant alleges that as to each and every cause of action alleged in the Complaint, the Court lacks personal jurisdiction over Defendant.

## SECOND AFFIRMATIVE DEFENSE

### Comparative Fault/Negligence of Others

As a separate and further affirmative defense, this answering Defendant alleges that the sole proximate cause of the injuries and damages, if any, allegedly suffered by the Plaintiffs were the negligence and fault of persons or entities other than this answering Defendant, for whose acts or omissions this answering Defendant is not legally or otherwise responsible.

## THIRD AFFIRMATIVE DEFENSE

### Failure to State a Cause of Action

As a separate and further affirmative defense, this answering Defendant alleges that the Complaint fails to state facts sufficient to constitute a cause of action against this answering Defendant.

## FOURTH AFFIRMATIVE DEFENSE

### Comparative Fault/Negligence of Plaintiffs

As a separate and further affirmative defense, this answering Defendant alleges that Plaintiffs were themselves careless and negligent in and about the matters alleged in the

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

1  Complaint, and that this carelessness and negligence on Plaintiffs' part contributed as a

2  proximate cause to the happening of the incident, the injuries, and loss and damage

3  complained of, and any recovery by Plaintiffs should be reduced or eliminated based upon

4  their comparative fault.

5  **FIFTH AFFIRMATIVE DEFENSE**

**Lack of Subject Matter Jurisdiction**

7  As a separate and further affirmative defense, this answering Defendant alleges that

8  as to each and every cause of action alleged in the Complaint, the Court lacks subject matter

9  jurisdiction over Defendant.

10  **SIXTH AFFIRMATIVE DEFENSE**

11  **Lack of Capacity**

12  As a separate and further affirmative defense, this answering Defendant alleges that

13  said Complaint contains a defect in the parties whereby Plaintiffs lack capacity to sue for

14  those claims set forth therein.

15  **SEVENTH AFFIRMATIVE DEFENSE**

16  **Misjoinder of Parties**

17  As a separate and further affirmative defense, this answering Defendant alleges that

18  said Complaint arises from a misjoinder of named parties whereby Plaintiffs lack capacity

19  to sue for those claims set forth therein.   Such misjoinder will result in prejudice to

20  Defendant.

21  **EIGHTH AFFIRMATIVE DEFENSE**

22  **Failure to Join Necessary Parties**

23  As a separate and further affirmative defense, this answering Defendant alleges that

24  said Plaintiffs failed to join necessary parties whereby in the interest of justice and fairness

25  the action cannot proceed in the absence of the parties that should have been joined.

26

27

28

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

-6-
ANSWER TO COMPLAINT

1

### NINTH AFFIRMATIVE DEFENSE

2

### Real Parties in Interest

3          As a separate and further affirmative defense, this answering Defendant alleges that

4   Plaintiffs are not the real parties in interest, and lack standing to bring the claims set forth

5   therein.

6

### TENTH AFFIRMATIVE DEFENSE

7

### Failure to Mitigate Damages

8          As a separate and further affirmative defense, this answering Defendant alleges that

9   at all times and places mentioned in the Complaint, Plaintiffs failed to mitigate their

10  damages.  The damages claimed by Plaintiffs could have been mitigated by due diligence

11  on their part or by one acting under similar circumstances.  Any recovery by Plaintiffs

12  should be reduced or eliminated due to their failure to mitigate their damages.

13

### ELEVENTH AFFIRMATIVE DEFENSE

14

### Spoliation of Evidence

15         As a separate and further affirmative defense, this answering Defendant alleges that

16  Plaintiffs, either intentionally or negligently, failed to preserve the primary evidence

17  relevant to this litigation, thus failing to afford this answering Defendant an opportunity to

18  inspect such evidence, thereby severely prejudicing Defendant.  Plaintiffs are therefore

19  barred from introducing secondary or lesser evidence, and any recovery should be

20  diminished accordingly.

21

### TWELFTH AFFIRMATIVE DEFENSE

22

### Doctrine of Laches

23         As a separate and further affirmative defense, this answering Defendant alleges that

24  Plaintiffs have unreasonably delayed in bringing this action to the prejudice of Defendant

25  and this action are therefore barred by reason of the doctrine of laches.

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

26

27

28

## THIRTEENTH AFFIRMATIVE DEFENSE

### Assumption of Risk

As a separate and further affirmative defense, this answering Defendant alleges that Plaintiffs had full knowledge of all the risks, dangerousness and hazards, if any there were, and nevertheless voluntarily and with full appreciation of the amount of danger involved in its actions and the magnitude of risk involved, assumed the risk of damages to themselves.

## FOURTEENTH AFFIRMATIVE DEFENSE

### Causation

As a separate and further affirmative defense, this answering Defendant alleges that its conduct was not the cause in fact or the proximate cause of any of the losses alleged by Plaintiffs.

## FIFTEENTH AFFIRMATIVE DEFENSE

### No Notice of Dangerous Condition

As a separate and further affirmative defense, this answering Defendant alleges that it had no notice, or inadequate notice, of any dangerous conditions that may or may not have existed at the time of the losses alleged by Plaintiffs, such that any preventative measures could have been taken.

## SIXTEENTH AFFIRMATIVE DEFENSE

### Statutes of Limitations and/or Repose

As a separate and further affirmative defense, this answering Defendant alleges that the Complaint of Plaintiffs is barred by the applicable statutes of limitations and/or repose, including but not limited to the statutes of limitation stated in Part 2, Title 2, Chapter 3, of the California Code of Civil Procedure, beginning with Section 335, and continuing through Section 349.4 and Sections 337, 337.1, 337.15, 337.5, 338, 339, 340 and/or 343.

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

**SEVENTEENTH AFFIRMATIVE DEFENSE**

**Reduction of Workers' Compensation Lien**

As a separate and further affirmative defense, this answering Defendant alleges that at all times material herein, Plaintiffs were in the course and scope of their employment and that they were subject to the provisions of the Workers' Compensation Act of the State of California; that certain sums have been paid to or on behalf of Plaintiffs under the applicable provisions of the Labor Code of the State of California; that Plaintiffs' employers and Plaintiffs' co-employees were negligent and careless and that such negligence and carelessness proximately contributed to and caused the injuries of Plaintiffs, if any; and that under the doctrine of *Witt v. Jackson* such negligence and carelessness should reduce or eliminate any lien claim or claim which may be made for reimbursement of Workers' Compensation benefits paid to or on behalf of Plaintiffs.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

**Apportionment**

As a separate and further affirmative defense, this answering Defendant alleges that if it is found liable for any injury and damage to Plaintiffs, then said liability, if any, must be limited to this answering Defendant's proportionate share of fault, if any there be, pursuant to Code of Civil Procedure Section 1431.2.

**NINETEENTH AFFIRMATIVE DEFENSE**

**Alteration**

As a separate and further affirmative defense, this answering Defendant alleges that the subject products/services/work identified in the Complaint were misused, modified, altered and/or subjected to certain treatment by Plaintiffs and/or other unknown individuals or entities which substantially changed the performance, application characteristics, composition and formulation of the subject products after they left this answering Defendant's custody and control.

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

-9-

ANSWER TO COMPLAINT

## TWENTIETH AFFIRMATIVE DEFENSE

### Reservation of Rights

As a separate and further affirmative defense, this answering Defendant alleges that Defendant presently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, defenses available. Defendant reserves herein the right to assert additional defenses in the event discovery indicates that it would be appropriate.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### Estoppel

As a separate and further affirmative defense, this answering Defendant alleges that Plaintiffs have waived and/or are estopped from alleging the matters set forth in their Complaint.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### Discharge of Duties

As a separate and further affirmative defense, this answering Defendant alleges that prior to the commencement of this action, this answering Defendant duly performed, satisfied and discharged all of its respective duties and obligations arising out of any and all agreements, representations or contracts made by it.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### Trivial Defect

As a separate and further affirmative defense, this answering Defendant alleges that the claims asserted in the Complaint are barred by the trivial defect doctrine.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### No Actual or Constructive Knowledge

As a separate and further affirmative defense, this answering Defendant alleges that Plaintiffs' claims against Defendant are barred in whole or in part because Defendant had no actual or constructive knowledge of the subject products' alleged defects.

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

ANSWER TO COMPLAINT

1

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

2

**Waiver**

3    As a separate and further affirmative defense, this answering Defendant alleges that

4 the Complaint and each of cause of action thereof is barred by Waiver.

5

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**

6

**Products Liability - Unforeseeable Use**

7    As a separate and further affirmative defense, this answering Defendant alleges that

8 if Plaintiffs sustained injuries attributable to the use of any product of this Defendant, which

9 allegations are expressly denied, the injuries were caused in whole or in part by the

10 unreasonable, unforeseeable and inappropriate purpose and/or improper use which was

11 made of the product.

12

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

13

**Compliance with Standards**

14    As a separate and further affirmative defense, this answering Defendant alleges that

15 the methods and procedures employed in manufacturing, assembling, packaging,

16 distributing, supplying and selling the products and/or services complied with all industry

17 standards, federal, state and local regulations, and applicable states of the art in the industry

18 at all times mentioned herein.

19

**TWENTY-EIGHTH AFFIRMATIVE DEFENSE**

20

**Products Liability - Misuse and Abuse**

21    As a separate and further affirmative defense, this answering Defendant alleges that

22 the damages complained of in the Complaint were caused in whole or in part by the misuse

23 and abuse of the product.

24

**TWENTY-NINTH AFFIRMATIVE DEFENSE**

25

**Warranty – Failure to State Cause of Action**

26    As a separate and further affirmative defense, this answering Defendant alleges that

27 the Complaint and each cause of action thereof fails to state a cause of action in that

28 Plaintiffs failed to give timely and proper notice of breach of warranty.

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

ANSWER TO COMPLAINT

## THIRTIETH AFFIRMATIVE DEFENSE

### Products Liability – Modification, Alteration, and Change

As a separate and further affirmative defense, this answering Defendant alleges that the injuries and damages sustained by Plaintiffs, if any, were solely and legally caused by the modification, alteration or change of the product referred to in the Complaint and said modification, alteration or change was performed by persons or entities other than this answering Defendant and without Defendant's knowledge or consent.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

### Unclean Hands

As a separate and further affirmative defense, this answering Defendant alleges that Plaintiffs are barred from recovery by reason of their unclean hands.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

### Relief Sought Based on Other States' Laws

As a separate and further affirmative defense, this answering Defendant alleges that Plaintiffs' claims against Defendant are barred to the extent that Plaintiffs seek relief under the laws of states that do not govern Plaintiffs' claims.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

### Proposition 51

As a separate and further affirmative defense, this answering Defendant alleges that if this answering Defendant is found liable for any injury and damage to Plaintiffs, then said liability for non-economic damages to Plaintiffs must be limited to this answering Defendant's proportionate share of fault, if any there be, as defined by Cal. Civil Code Section 1431.2 et seq.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

### Res Judicata

As a separate and further affirmative defense, this answering Defendant alleges that Plaintiffs' Complaint, and each cause of action thereof, is barred by the doctrine of Res Judicata.

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

1

## THIRTY-FIFTH AFFIRMATIVE DEFENSE

2

### Collateral Estoppel

3    As a separate and further affirmative defense, this answering Defendant alleges that

4 Plaintiffs' Complaint, and each cause of action thereof, is barred by the doctrine of

5 Collateral Estoppel.

6

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

7

### Adequacy of Warning

8    As a separate and further affirmative defense, this answering Defendant alleges that

9 Plaintiffs' claims against Defendant are barred, in whole or in part, because the products at

10 issue were designed, manufactured, marketed, and labeled with proper warnings,

11 information, cautions and instructions, in accordance with the state of the art and the state

12 of scientific and technological knowledge.

13

## THIRTY-SEVENTH AFFIRMATIVE DEFENSE

14

### Federal Preemption

15    As a separate and further affirmative defense, this answering Defendant alleges that

16 the claims alleged in Plaintiffs' Complaint are expressly or impliedly preempted by federal

17 laws, regulations and/or policies governing the specific product(s) or manufacturing

18 processes alleged by Plaintiffs to have resulted in Plaintiffs' damages.

19

## THIRTY-EIGHTH AFFIRMATIVE DEFENSE

20

### Conformity with Specifications Established by U.S. Government

21    As a separate and further affirmative defense, this answering Defendant alleges that

22 any product in question was manufactured in conformity with the specifications established

23 by the United States Government and any alleged defect in the product was the result of

24 deficiencies in such specifications which are unknown to Defendant, and which

25 deficiencies would be an intervening and superseding cause of any alleged injuries, losses

26 or damages to Plaintiffs.

27

28

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

ANSWER TO COMPLAINT

## THIRTY-NINTH AFFIRMATIVE DEFENSE

### Minimal Exposure

As a separate and further affirmative defense, this answering Defendant alleges that any exposure of Plaintiffs to products utilized by Defendant, which exposure is expressly denied, was so minimal as to be insufficient to establish a reasonable degree of probability that the product caused Plaintiffs' claimed injuries and illness.

## FORTIETH AFFIRMATIVE DEFENSE

### Good Faith

As a separate and further affirmative defense, this answering Defendant alleges that at all times, Defendant acted in good faith and with a reasonable belief in the lawfulness of its conduct.

## FORTY-FIRST AFFIRMATIVE DEFENSE

### Product Not Defective or Unreasonably Dangerous

As a separate and further affirmative defense, this answering Defendant alleges that Plaintiffs' claims against Defendant are barred in whole because Plaintiffs cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

## FORTY-SECOND AFFIRMATIVE DEFENSE

### FIFRA Statutory Preemption

As a separate and further affirmative defense, this answering Defendant alleges that Plaintiffs' claims against Defendant are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling, distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

## FORTY-THIRD AFFIRMATIVE DEFENSE

### Preemption—Continued EPA Approval

As a separate and further affirmative defense, this answering Defendant alleges that Plaintiffs' claims against Defendant are preempted, in whole or in part, because of findings

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

by the United States Environmental Protection Agency ("U.S. EPA") that glyphosate does not cause cancer in humans and/or because of U.S. EPA-approved product labeling.

## FORTY-FOURTH AFFIRMATIVE DEFENSE

### Primary Jurisdiction

As a separate and further affirmative defense, this answering Defendant alleges that Plaintiffs' claims against Defendant are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

## FORTY-FIFTH AFFIRMATIVE DEFENSE

### Independent/Intervening/Superseding Causes

As a separate and further affirmative defense, this answering Defendant alleges that Plaintiffs' claims against Defendant are barred, in whole or in part, because Plaintiffs' injuries, if any, were the result of conduct of Plaintiffs, independent third parties, and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to Plaintiffs' pre-existing medical conditions.

## FORTY-SIXTH AFFIRMATIVE DEFENSE

### Restatement (Second) of Torts § 402A

As a separate and further affirmative defense, this answering Defendant alleges that the doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar Plaintiffs' claims against Defendant in whole or in part.

## FORTY-SEVENTH AFFIRMATIVE DEFENSE

### Alternative Causes

As a separate and further affirmative defense, this answering Defendant alleges that if Plaintiffs suffered injuries or damages as alleged, which is denied, such injuries or damages resulted from: (a) acts or omissions of persons or entities for which Defendant is neither liable nor responsible or, in the alternative, Defendant is entitled to an assessment of the relative degree of fault of all such persons and entities; or (b) resulted from diseases and/or causes that are not related or connected with any product sold, distributed, or

Goodman
Neuman
Hamilton LLP
One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

1  manufactured by Defendant.  Such acts or omissions on the part of others or diseases or

2  causes constitute an independent, intervening and sole proximate cause of Plaintiffs'

3  alleged injuries or damages.

4  **FORTY-EIGHTH AFFIRMATIVE DEFENSE**

5  **Lack of Privity; No Duty**

6  As a separate and further affirmative defense, this answering Defendant alleges that

7  Defendant had no legal relationship or privity with Plaintiffs and owed no duty to Plaintiffs

8  by which liability could be attributed to it.

9  **FORTY-NINTH AFFIRMATIVE DEFENSE**

10  **Commercial Free Speech**

11  As a separate and further affirmative defense, this answering Defendant alleges that

12  Plaintiffs' claims against Defendant are preempted or otherwise barred in whole or in part

13  by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution.

14  **FIFTIETH AFFIRMATIVE DEFENSE**

15  **Punitive Damages Unconstitutional**

16  As a separate and further affirmative defense, this answering Defendant alleges that

17  Plaintiffs' claims against Defendant for punitive damages are barred because such an award

18  would violate Defendant's due process, equal protection and other rights under the United

19  States Constitution, the California Constitution, and/or other applicable state constitutions

20  – and would be improper under the common law and public policies of the United States,

21  the laws of California and/or other states' laws.

22  **FIFTY-FIRST AFFIRMATIVE DEFENSE**

23  **Conduct Does Not Warrant Punitive Damages**

24  As a separate and further affirmative defense, this answering Defendant alleges that

25  Plaintiffs' claims against Defendant for punitive damages are barred because Plaintiffs

26  have failed to allege conduct warranting imposition of punitive damages under California

27  and/or other applicable state laws.

28

Goodman
Neuman
Hamilton LLP
One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

1

## FIFTY-SECOND AFFIRMATIVE DEFENSE

2

### Punitive Damages Barred or Limited by Operation of Law

3      As a separate and further affirmative defense, this answering Defendant alleges that

4   Plaintiffs' claims against Defendant for punitive damages are barred and/or limited by

5   operation of state and/or federal law.

6

## FIFTY-THIRD AFFIRMATIVE DEFENSE

7

### Sophisticated User Doctrine

8      As a separate and further affirmative defense, this answering Defendant alleges that

9   Plaintiffs' claims against Defendant are barred in whole or in part by the sophisticated user

10  doctrine.

11

## FIFTY-FOURTH AFFIRMATIVE DEFENSE

12

### Collateral Source

13     As a separate and further affirmative defense, this answering Defendant alleges that

14  to the extent that Plaintiffs recovered payments for Plaintiffs' alleged injuries from any

15  collateral source(s) or other source(s), Plaintiffs' recovery in this lawsuit, if any, shall be

16  reduced to the extent allowed by applicable law.

17

## FIFTY-FIFTH AFFIRMATIVE DEFENSE

18

### Alleged Injuries Not Caused by Home Depot Product

19     As a separate and further affirmative defense, this answering Defendant alleges that

20  if Plaintiffs have been injured or damaged, no injuries or damages being admitted, such

21  injuries or damages were not caused by a Home Depot product.

22

## FIFTY-SIXTH AFFIRMATIVE DEFENSE

23

### Inconvenient Venue

24     As a separate and further affirmative defense, this answering Defendant alleges that

25  venue is or may be inconvenient for some or all of Plaintiffs' claims.

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

26

27

28

1

## FIFTY-SEVENTH AFFIRMATIVE DEFENSE

2

### Improper Service

3

As a separate and further affirmative defense, the answering Defendant alleges that

4

service may be improper.

5

## FIFTY-EIGHTH AFFIRMATIVE DEFENSE

6

### Improper Venue

7

As a separate and further affirmative defense, the answering Defendant alleges that

8

venue may be improper.

9

WHEREFORE, Defendant prays that:

10

1.      Plaintiffs take nothing against it by their Complaint;

11

2.      Judgment be entered in favor of Defendant and against Plaintiffs;

12

3.      Defendant be awarded its costs of suit; and

13

4.      Such other and further relief as the court deems just and proper.

14

### DEMAND FOR JURY TRIAL

15

Defendant Home Depot Product Authority, LLC hereby demands a jury trial in the

16

above-referenced action.

17

18

DATED:  July 8, 2021                    GOODMAN NEUMAN HAMILTON LLP

19

20

By: _____

21

JOSHUA S. GOODMAN
RUTA PASKEVICIUS

22

Attorneys for Defendant
Home Depot Product Authority, LLC

23

24

25

26

27

28

Goodman
Neuman
Hamilton LLP

One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

-18-

1

**PROOF OF SERVICE**

2
**CASE NAME:**  *Thomas P. Danielson, et al. v Monsanto Company, et al.*

**CASE NUMBER:**  CGC-21-591896

3
**DATE OF SERVICE:** July 8, 2021

**DESCRIPTION OF DOCUMENTS SERVED:**

4

5
**HOME DEPOT PRODUCT AUTHORITY, LLC'S ANSWER TO ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL**

6
**SERVED ON THE FOLLOWING:**

7
**ALL COUNSEL**

8
I am over the age of 18 years and not a party to or interested in the above-named case.  I am an employee of Goodman Neuman Hamilton LLP, and my electronic business address is mvalentine@gnhllp.com.  On the date stated above, I served a true copy of the document(s) described above by E-Mail or Electronic Transmission:  Based on a court order or agreement of the parties to accept service by email or electronic transmission, through File & ServeXpress, I caused the documents to be sent to the person(s) on the electronic service list maintained by File & ServeXpress with this case.  I did not receive, within a reasonable time after transmission, any electronic message or other indication that the transmission was unsuccessful.  A copy of the electronic filing receipt will be maintained with the original document in our file.

9

10

11

12

13

14
I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on the date stated above.

15

16
*Michelle Valentine*

Michelle Valentine

17

18

19

20

21

22

23

24

25
Goodman
Neuman
Hamilton LLP

26
One Post Street
Suite 2100
San Francisco, CA
94104
Tel.: (415) 705-0400

27

28